[S.F. 24145. Feb. 11, 1981.]

GLEN DeRONDE, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Appellants.

**COUNSEL**

Glen DeRonde, in pro. per., and John A. DeRonde, Jr., for Plaintiff and Appellant.

Donald L. Reidhaar, John F. Lundberg, Gary Morrison, Lawrence B. Garcia, Harry C. White, Jr., and Patrick K. Moore for Defendants and Appellants.

Cecily B. Nyomarkay, Ralph W. Hilton, David B. Seals, Jerold A. Prod, Lawrence B. Bolton, Richard H. Koppes, Patsy K. Crawford, Fred Okrand, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Jerry Budin, John Martinez, Gary Ransom, Jeanne E. Raya, Iris Brest, John J. Schwartz, Jack Greenberg, James M. Nabritt III, Napoleon B. Williams, Jr., John H. Erickson, Alice M. Beasley, Henry S. Hewitt, Erickson, Beasley & Hewitt, Mark N. Aaronson, Ronald T. Vera, Susan E. Brown, Peter D. Roos, Marsha L. Morrow, Long & Levit, Michael Wong, Penny N. Nakatsu, Stanley Mark, Bill Lann Lee, David G. Robertson, Linda L. McCall, Morrison & Foerster, Edward H. Steinman and Wayne McCormack as Amici Curiae on behalf of Defendants and Appellants.

**OPINION**

**RICHARDSON, J.**—Were the admissions procedures permitting consideration of "ethnic minority status" as a factor in the 1975 selection

of the first year class at King Hall, the University of California at Davis School of Law, violative of the equal protection guarantees afforded nonminorities under the federal or state Constitutions? We conclude that they were not.

Plaintiff Glen DeRonde, a white male, was 1 of 2,238 applicants seeking enrollment in King Hall in 1975. On the basis of criteria hereinafter described, 406 applicants were extended offers of admission. In July 1975, DeRonde, an unsuccessful applicant, sought mandamus in the Yolo County Superior Court against the Regents of the University of California and the Dean of King Hall (collectively described herein as the University), to compel his admission to King Hall and to recover damages for his exclusion. He attacked the University's selection procedures alleging that they were unconstitutional because of the preferences extended to minority applicants.

In February 1976 the trial court filed its notice of an intended decision holding that because DeRonde would have been unsuccessful even had the challenged procedures not been used, DeRonde was not entitled to the relief requested. Nonetheless, the court examined the merits of DeRonde's constitutional challenge, and concluded that because the University's admissions procedures were facially discriminatory they violated the equal protection clauses of both the state and federal Constitutions. The court therefore enjoined the University from utilizing any admission criteria based on an applicant's race, color or ethnic origin.

Following the announcement of the intended decision, several interested persons and organizations filed motions to intervene. These motions were denied and a judgment was entered in December 1976. (Although the denial of intervention was affirmed in a separate appeal, various unsuccessful interveners have appeared herein as amici curiae.) The University filed a notice of appeal, and DeRonde has cross-appealed.

In the interim DeRonde has graduated from another law school and has been admitted to the State Bar. Although he no longer seeks entry to King Hall, we have chosen not to dismiss the case as moot. The trial court judgment, enjoining the University, as it does, from its continued use of certain of its admissions criteria, has cast a substantial cloud of uncertainty over the University's multiple and widely used procedures. The parties and amici before us have thoroughly briefed the

constitutional issues and have urged us to resolve them. We have the benefit of additional instructive and controlling federal authority. There is ample precedent for appellate resolution of important issues of substantial and continuing public interest which otherwise may have been rendered moot and of no further immediate concern to the initiating parties. (E.g., *Johnson* v. *Hamilton* (1976) 15 Cal.3d 461, 465 [125 Cal.Rptr. 129, 541 P.2d 881], and cases therein cited.) We conclude that this is such a case and that the validity of "race conscious" or "race attentive" admissions programs is an important question of continuing statewide interest. Accordingly, we will resolve the issue.

After first examining the law school's admissions procedures we apply both the constitutional principles and analyses contained in appropriate federal and state authorities.

## I. THE UNIVERSITY'S 1975 ADMISSIONS PROCEDURES

The record discloses that in selecting candidates for admission to King Hall in 1975 the University relied principally on a formula which combined an applicant's previous academic grade point average (GPA) with his or her score on the standardized law school admissions test (LSAT). This formula yielded a predicted first year average (PFYA) which, it was hoped, measured, at least roughly, the applicant's potential for law study.

Believing, however, that the foregoing formula tended to ignore other significant and relevant selection factors, the University considered several additional background elements to supplement or mitigate a lower PFYA. These factors included (1) growth, maturity and commitment to law study (as shown by prior employment, extracurricular and community activities, advanced degrees or studies, and personal statements and recommendations), (2) factors which, while no longer present, had affected previous academic grades (such as temporary physical handicaps or disruptive changes in school or environment), (3) wide discrepancies between grades and test scores where there was indicated evidence of substantial ability and motivation, (4) rigor of undergraduate studies, (5) economic disadvantage, and (6) "ethnic minority status" contributing to diversity.

It is the consideration by the University of the final factor, "ethnic minority status," which is the principal target of DeRonde's attack. Trial testimony established that "ethnic minority status" was defined by

the University as including Asians, blacks, Chicanos, native Americans and Filipinos. This grouping generally corresponds to the ethnic categories defined by the federal Equal Employment Opportunity Commission in its public reports. The record reflects that the University's reasons for considering minority status were primarily twofold: First, an appreciable minority representation in the student body will contribute a valuable cultural diversity for both faculty and students and, second, a minority representation in the legal pool from which future professional and community leaders, public and private, are drawn will strengthen and preserve minority participation in the democratic process at all levels. In short, it was believed that the individual and group learning experience is enriched with broadly beneficial consequences both to the profession and to the public at large. We carefully emphasize that although minority status was included as one of several pertinent selection factors, the University did not employ any quota system or reserve a fixed number of positions for any minority applicants in its entering class.

Just as a relatively low PFYA might be increased by utilization of any of the foregoing factors, alternatively, a relatively high PFYA could be reduced by considering (1) the applicant's prior schools attended, (2) the difficulty of his or her prior course of study, (3) variations in an applicant's multiple LSAT scores, (4) the absence of any factors indicating maturity or motivation, and (5) the applicant's advanced age.

As a consequence of this formulation, in 1975, the 406 students to whom the University offered admission included 135 minority applicants, and more than 1,800 applicants including DeRonde were rejected. DeRonde's 3.47 GPA and 575 LSAT score produced a 2.70 PFYA. The PFYAs of successful applicants ranged from 2.24 to 3.43. Sixty-nine minority applicants were accepted with PFYAs lower than DeRonde's. On the other hand, the more than 800 unsuccessful applicants who had higher PFYAs than DeRonde included 35 minority applicants. It was on the basis of these latter statistics that the lower court found that DeRonde would have been rejected for admission even if the University had not employed an admissions procedure which gave consideration to "ethnic minority status."

We examine the constitutional issues.

## II. FEDERAL CONSTITUTION

■   Our analysis of the federal constitutional questions is both aided and controlled by the decision of the United States Supreme Court in *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733]. In that case, Bakke, a disappointed white male applicant for admission to the School of Medicine at the University of California at Davis, challenged on equal protection grounds an admissions policy which reserved to disadvantaged minority (Asian, American Indian, Black, and Chicano) students 16 of the 100 available seats. Although a majority of the high court invalidated this fixed quota system, multiple opinions were filed.

Four justices (Stevens, J., joined by Burger, C. J., Stewart and Rehnquist, JJ.) found it unnecessary to reach the constitutional issue, concluding as they did that the Davis quota system violated the general antidiscrimination provisions of title VI of the federal Civil Rights Act. (See 438 U.S. at pp. 408, 421 [57 L.Ed.2d at pp. 845, 853].) Four other justices (Brennan, White, Marshall, and Blackmun, JJ., writing a joint opinion hereafter referred to as the Brennan opinion) were of the view that the quota system (as well as other race conscious admissions systems) was proper under both the Civil Rights Act and the federal Constitution, as a means of overcoming the effects of past discrimination. (See *id.*, at pp. 324, 362, 369 [57 L.Ed.2d at pp. 792, 816, 821].)

Justice Powell, writing separately and joined by no other justice, concurred in striking down the Davis quota system, thereby affording majority support for its invalidity. In stating his view that the Davis quota system was unconstitutional under the federal equal protection clause, he characterized the Davis procedure as one employing "an explicit racial classification never before countenanced by this Court. It tells applicants who are not Negro, Asian, or Chicano that they are totally excluded from a specific percentage of the seats in an entering class." (P. 319 [57 L.Ed.2d at p. 789].)

A majority of the justices voted to overturn the challenged system. Of even greater importance to the resolution of the present case, however, a separate but clear majority of the high court (namely, Powell, Brennan, White, Marshall, and Blackmun, JJ.) indicated *approval* of race conscious admissions programs similar to the University's procedure under scrutiny here. (See pp. 316-319 [57 L.Ed.2d at pp. 787-789] [opn. of Powell, J.]; 324-326, and fn. 1 [57 L.Ed.2d at pp. 792-793] [opn. of

Brennan, J.].) Because two separate lines of high court reasoning converged to reach this conclusion, we review each opinion separately.

In passing, we note that a comparable analytical approach was used by the Washington Supreme Court in *McDonald* v. *Hogness* (1979) 92 Wn.2d 431 [598 P.2d 707, 712-715], certiorari denied 445 U.S. 962 [64 L.Ed.2d 238, 100 S.Ct. 1650], in upholding a race-sensitive medical school admissions program closely akin to the University's procedures herein challenged. *Bakke* itself has drawn much academic interest and attention, expressed in many useful law review articles, several of which adopt a comparable analysis of the various *Bakke* opinions. (See, e.g., *A Symposium: Regents of the University of California v. Bakke* (1979) 67 Cal.L.Rev. 1 et seq.; Karst & Horowitz, *The Bakke Opinions and Equal Protection Doctrine* (1979) 14 Harv.Civ.Rights-Civ. Lib. L.Rev. 7; Lesnick, *What Does Bakke Require of Law Schools* (1979) 128 U.Pa. L.Rev. 141; Stone, *Equal Protection in Special Admissions Programs: Forward from Bakke* (1979) 6 Hastings Const.L.Q. 719; Note, *The Supreme Court, 1977 Term, Constitutional Law* (1978) 92 Harv.L.Rev. 57, 131.)

a) *The Powell Opinion.* Because Justice Powell represented the "swing" or pivotal vote in *Bakke*, we focus first on his views. He concluded that although any race conscious classification must serve a compelling governmental interest (see pp. 299, 305 [57 L.Ed.2d at pp. 776-777, 780-781]), nevertheless "the State has a substantial interest that legitimately may be served by a properly devised admissions program involving the competitive consideration of race and ethnic origin" (p. 320 [57 L.Ed.2d at p. 790]). He expressly cited with approval the admissions procedures used at Harvard College, whereby diversity among its students is sought without using racial quotas or otherwise precluding qualified applicants from competing for all available seats in the entering class. "Diversity" under the Harvard program includes a variety of factors, such as geographic origin, unusual life experience, special talent and educational qualifications, as well as disadvantaged economic, racial or ethnic background.

We find significance in Justice Powell's description and evaluation of the Harvard program: "In such an admissions program, race or ethnic background may be deemed a 'plus' in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats. The file of a particular black applicant may be examined for his potential contribution to diversity without the

factor of race being decisive when compared, for example, with that of an applicant identified as an Italian-American if the latter is thought to exhibit qualities more likely to promote beneficial educational pluralism. Such qualities could include exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important. In short, an admissions program operated in this way is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight. Indeed, the weight attributed to a particular quality may vary from year to year depending upon the 'mix' both of the student body and the applicants for the incoming class.

"This kind of program treats each applicant as an individual in the admissions process. The applicant who loses out on the last available seat to another candidate receiving a 'plus' on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. It would mean only that his combined qualifications, which may have included similar nonobjective factors, did not outweigh those of the other applicant. His qualifications would have been weighed fairly and competitively, and he would have no basis to complain of unequal treatment under the Fourteenth Amendment." (Pp. 317-318 [57 L.Ed.2d at pp. 788-789].)

In our view the admissions procedures used by the University to select its 1975 entering class at King Hall does not vary in any significant way from the Harvard program. Minority racial or ethnic origin was one of several competing factors used by the University to reach its ultimate decision whether or not to admit a particular applicant. Each application, as contemplated by the program, was individually examined and evaluated in the light of the various positive and negative admission factors. As Justice Powell pointedly observed, the primary and obvious defect in the quota system in *Bakke* was that it *precluded* individualized consideration of every applicant without regard to race. (Pp. 317-318, and fn. 52 [57 L.Ed.2d at pp. 788-789].) That fatal flaw does not appear in the admissions procedure before us. This is not a quota case. Thus, we conclude that the race attentive admissions procedure used by the University in 1975 would have passed federal

constitutional muster under the standards prescribed by Justice Powell in *Bakke.*

b) *The Brennan Opinion.* The Brennan opinion, representing the views of four justices, would have upheld the Davis quota system invalidated by the majority in *Bakke.* It may fairly be concluded that a race conscious law school admissions program that did not involve a quota, a fortiori, would be sustained by those holding the Brennan view. Justice Brennan also expressed approval of the Harvard admissions program, albeit on a different ground than the diversity benefit emphasized by Justice Powell. Justice Brennan "agree[d] with MR. JUSTICE POWELL that a plan like the 'Harvard' plan . . . is constitutional under our approach, at least so long as the use of race to achieve an integrated student body is necessitated by the lingering effects of past discrimination." (P. 326, fn. 1 [57 L.Ed.2d at p. 793]; see also pp. 378-379 [57 L.Ed.2d at pp. 826-827] [expressing the view that the Harvard plan is "no more or less constitutionally acceptable" than the Davis quota system ruled invalid by the majority].) Justice Brennan expands the foregoing requirement of a past discriminatory effect and would hold that even a racial quota system such as involved in *Bakke* was constitutional if its purpose "is to remove the disparate racial impact [the University's] actions might otherwise have and if there is reason to believe that the disparate impact is itself the product of past discrimination, whether its own or that of society at large." (P. 369 [57 L.Ed.2d at pp. 820-821].)

Because the trial of the present case preceded the filing of federal *Bakke*, the parties, of course, neither framed nor litigated the issue —whether the University's admissions program was "necessitated by the lingering effects of past discrimination." Nevertheless, in our view, the record before us does amply establish "past discrimination" within the contemplation of the Brennan opinion and standards.

First, the evidence supports a finding that the use of a race conscious admissions program was needed to prevent a disproportionate underrepresentation of minorities in King Hall. The testimony of Professor Barrett, former dean of the law school, stressed that if admission selection was based solely upon "numbers" (i.e., GPA and LSAT scores), "the greatest bulk of the minority applicants" would be excluded. No contrary testimony was introduced at trial.

Second, past societal discrimination against ethnic minorities is an unfortunate, but demonstrable, historical fact acknowledged in both the Powell (p. 296, fn. 36 [57 L.Ed.2d at p. 816]) and Brennan (pp. 369-373 [57 L.Ed.2d at pp. 820-823]) opinions in *Bakke*, as well as by a majority of this court in *Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257, 286 [161 Cal.Rptr. 475, 604 P.2d 1365] (referring to "the pervasive discrimination long endured by minorities in our society").

Finally, the existence of a nexus between past discrimination and present disproportionate academic and professional underrepresentation was fully acknowledged in the Brennan opinion itself, wherein it was readily assumed that societal discrimination against minorities has impaired their access to equal educational opportunity. As the opinion states, "Davis clearly could conclude that the serious and persistent underrepresentation of minorities in medicine ... *is the result of handicaps under which minority applicants labor as a consequence of a background of deliberate, purposeful discrimination against minorities in education and in society generally*, as well as in the medical profession. [Pp. 370-371 (57 L.Ed.2d at pp. 821-822).] ... [¶] Judicial decrees recognizing discrimination in public education in California testify to the fact of widespread discrimination suffered by California-born minority applicants; ... [T]he conclusion is inescapable that applicants to medical school must be few indeed who endured the effects of *de jure* segregation, the resistance to *Brown I* [*Brown* v. *Board of Education* (1954) 347 U.S. 483 (98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180)], or the equally debilitating pervasive private discrimination fostered by our long history of official discrimination [citation], and yet come to the starting line with an education equal to whites." (P. 372, [57 L.Ed.2d, pp. 822-823], italics added, fns. omitted.)

Although the foregoing observations were expressed within the context of a discussion of minority admissions to medical school, it seems fair to conclude that the justices joining in the Brennan opinion would reach an identical conclusion with respect to the effect of past societal discrimination upon minority applicants to King Hall. While Justice Powell regarded as too speculative the provability of any connection between past discrimination and minority failures to gain admission (see p. 296, fn. 36 [57 L.Ed.2d, p. 775]), no such misgivings are expressed in the Brennan opinion.

Accordingly, we conclude that, whether based on the Powell reasoning of assuring an academically beneficial diversity among the student

body, or on the Brennan rationale of mitigating the effects of historical discrimination, it is abundantly clear that the University's 1975 admissions program would, on its face, meet federal constitutional standards as declared by a majority of the justices of the high court.

■ We readily acknowledge, of course, that a facially valid procedure may in its actual application produce a constitutionally discriminatory result. Indeed, Justice Powell in *Bakke* fully and fairly both raised the possibility and anticipated the answer, noting: "It has been suggested that an admissions program which considers race only as one factor is simply a subtle and more sophisticated—but no less effective—means of according racial preference than the Davis program. A facial intent to discriminate, however, is evident in petitioner's preference program and not denied in this case. *No such facial infirmity exists in an admissions program where race or ethnic background is simply one element—to be weighed fairly against other elements—in the selection process.... And a court would not assume that a university, professing to employ a facially nondiscriminatory admissions policy, would operate it as a cover for the functional equivalent of a quota system. In short, good faith would be presumed in the absence of a showing to the contrary* in the manner permitted by our cases. [Citations.]" (Pp. 318-319 [57 L.Ed.2d, p. 789], italics added; but see pp. 378-379 [57 L.Ed.2d, pp. 826-827] [opn. of Brennan, J.].) Again, we emphasize Justice Powell's analysis on the point because the Brennan group presumably would permit even a deliberate and systematic exclusion of white applicants if supported by the requisite showing of past discrimination.

Justice Powell further observed that "So long as the university proceeds on an individualized, case-by-case basis, there is no warrant for judicial interference in the academic process. If an applicant can establish that the institution does not adhere to a policy of individual comparisons, or can show that a systematic exclusion of certain groups results, the presumption of legality might be overcome, creating the necessity of proving legitimate educational purpose." (*Id.*, at p. 319, fn. 53 [57 L.Ed.2d at p. 789].)

The record before us is barren of any evidence showing that the University was deliberately using the challenged admissions procedure either as a "cover" for a quota system or as a means of systematic exclusion of, or discrimination against, white male applicants such as DeRonde. The trial court made no such finding. Without proof of such

an intent, the University's procedures must be upheld against a claim of unlawful racial discrimination even if accompanied by some evidence of a disproportionate impact. (See *Bakke*, p. 289, fn. 27 [57 L.Ed.2d, p. 770] [opn. of Powell, J.]; *Arlington Heights* v. *Metropolitan Housing Corp.* (1977) 429 U.S. 252, 264-266 [50 L.Ed.2d 450, 463-465, 97 S.Ct. 555].)

Moreover, the evidence fails to support a finding of such disproportionate impact. The record does reflect that, between 1971 and 1977, the percentage of minorities in the entering classes at King Hall has been substantial, fluctuating from a low of 22.78 percent in 1971 to a high of 41.6 percent in 1976. From this arithmetic, DeRonde argues that "for six straight years from 1971 to 1976, the percentage of minority students entering classes at Davis Law School averaged 33% of those classes. This was at a time when more *highly qualified* male Caucasians were applying for admission than in the history of the school .... [¶] How can there be said to exist no 'disproportionate' impact when *extremely well-qualified* male Caucasian applicants outnumber *poorly-qualified* minority applicants by over three to one and are admitted to the school in a lesser percentage?" (Italics added.)

As the italicized portion of the argument reveals, the principal difficulty with DeRonde's statistical analysis is that it is based upon the faulty premise that it is only a high PFYA or GPA which truly "qualifies" an applicant for admission to law school. Yet as Justice Powell carefully explained in *Bakke*, racial or ethnic origin, as well as other "nonobjective" factors, such as personal talents, work experience or leadership potential, properly may be considered in weighing each applicant's qualifications. (438 U.S. at pp. 317-320 [57 L.Ed.2d at pp. 788-790]; for a probing analysis of the concept of "merit" within the academic context, see Fallon, *To Each According to His Ability, From None According to His Race: The Concept of Merit in the Law of Antidiscrimination* (1980) 60 B. U. L.Rev. 815, 871-876.)

DeRonde's statistics may indicate that the University has placed considerable weight upon racial or ethnic factors in determining the composition of its entering law classes. Yet nothing in *Bakke* prohibits such a practice, so long as individualized personal consideration is given to the varied qualifications of each applicant. Furthermore, the fact remains that male Caucasian applicants to King Hall continue to gain admission in respectable numbers. For example, according to DeRonde's own figures, in 1975, the year of DeRonde's application, 157

white males were offered admission as opposed to 133 minority applicants. We do not know the number of white females who were admitted. These statistics alone, however, would appear to contradict any assertion that the University has adopted or implemented a systematic plan or scheme to exclude male Caucasians.

We conclude that the University's 1975 admissions procedures did not violate the equal protection clause of the federal Constitution, as authoritatively interpreted by a majority of the United States Supreme Court in its *Bakke* decision. We turn then to DeRonde's contention that these procedures violated similar provisions of the California Constitution.

### III. CALIFORNIA CONSTITUTION

■ DeRonde, relying primarily upon the reasoning of the majority in *Bakke* v. *Regents of University of California* (1976) 18 Cal.3d 34 [132 Cal.Rptr. 680, 553 P.2d 1152], urges us to hold that the University's race conscious admissions program violated the equal protection guarantees of article I, section 7, of the state Constitution. DeRonde correctly observes that, on some prior occasions, a majority of our court has departed from applicable federal precedents in reliance upon state constitutional principles. (E.g., *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929]; *People* v. *Brisendine* (1975) 13 Cal.3d 528, 545 [119 Cal.Rptr. 315, 531 P.2d 1099].) As *Serrano* holds, the equal protection guarantees contained in article I, section 7, subdivision (a), of the California Constitution afford protections different from, and independent of, those extended by the Fourteenth Amendment. Yet in the specific context of minority advancement programs, we have stated our position quite recently and clearly, albeit by a divided court. In this area the court's majority has explicitly concluded that the state Constitution imposes no greater restrictions than similar guarantees provided by the federal charter. (*Price* v. *Civil Service Com., supra*, 26 Cal.3d 257, 284-285.) The principles of *Price* are clearly controlling here.

In *Price*, we upheld an affirmative action hiring program ordered by a county civil service commission as a means of alleviating an underrepresentation of minority employees attributable to past discriminatory employment practices by the hiring entity. We first observed that the county's hiring program was consistent with federal constitutional guarantees as declared by the United States Supreme Court in *Bakke* and

in *Steelworkers* v. *Weber* (1979) 443 U.S. 193 [61 L.Ed.2d 480, 99 S.Ct. 2721]. We then examined and rejected the argument that the program was barred under state equal protection principles, explaining: "Although the state equal protection guarantee embodied in article I, section 7, subdivision (a) of the California Constitution does provide safeguards separate and distinct from those afforded by the Fourteenth Amendment (see Cal. Const., art. I, § 24; see, e.g., *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 469 [156 Cal.Rptr. 14, 595 P.2d 592]), the district attorney points to no authority which suggests that the California equal protection clause should be interpreted to place greater restrictions on bona fide affirmative action programs than are imposed by the Fourteenth Amendment. To the contrary, our past decisions construing article I, section 7, subdivision (a) reflect this court's recognition of the importance of interpreting the provision in light of the realities of the continuing problems faced by minorities today. (See *Crawford* v. *Board of Education* (1976) 17 Cal.3d 280, 301-302 [130 Cal.Rptr. 724, 551 P.2d 28].) Viewed from this perspective, we conclude that the state equal protection clause erects no barrier to a municipality's adoption of the kind of affirmative action plan authorized by rule 7.10." (26 Cal.3d at pp. 284-285.)

Having held in *Price*, wherein an express quota was applied, that the *state* Constitution places no greater restrictions upon affirmative action programs encouraging increased minority representation than are imposed by the *federal* Constitution, a fortiori, under principles of stare decisis, we impose no state constitutional bar where the program involves no fixed quota but only consideration of race as one among several other qualifying factors. Although the University's admissions program at issue here is presented within the context of educational opportunity rather than employment hiring, the *Price* analysis is equally applicable.

In conclusion, both for practical and policy reasons, we do not lightly disregard pertinent decisions of the United States Supreme Court resolving issues of nationwide interest and importance. Uniform standards in the critical area of educational opportunity appear desirable. The high court's *Bakke* decision, although based on differing rationales, gives clear guidance for our decision to the extent that it is controlled by the equal protection requirements of the United States Constitution. We ourselves, by majority vote very recently in *Price*, concluded that even utilization of a fixed quota did not offend the California Constitution.

We have a traditional and instinctive reluctance to intrude unnecessarily into the administrative affairs of the University of California and do so only under clear constitutional or statutory mandate. A university requires a measure of "elbow room" within which to perform its functions. In its wisdom the appropriate administration-faculty-student admissions committee in full cooperation with the regents has proceeded upon a path which it believes will best achieve fairness and balance in the admission to the University's professional schools. It has done so for legally acceptable, educational purposes. The King Hall admissions program was conceived in good faith and, as demonstrated by the record before us, has thus far been implemented within constitutional boundaries.

The judgment is reversed to the extent that it (1) declares the University's admissions program is discriminatory and a violation of equal protection of the laws, (2) enjoins the University from any consideration of race, color or ethnic origin in the admissions process at King Hall, and (3) awards costs of suit to DeRonde. In all other respects, the judgment is affirmed.

Bird, C. J., Tobriner, J., and Rattigan, J.,* concurred.

MOSK, J.—I dissent.

The majority opinion, I regret to say, was preordained. Any court that would stray so far from basic principles of constitutional equal protection as to approve a rigid racial quota system in public employment (*Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257 [161 Cal.Rptr. 475, 604 P.2d 1365]) can be expected to accept any program of race consciousness in public education. But repetition does not disinfect, it exacerbates legal and social error.

The majority, armed in adamant, insist upon turning the calendar back several decades. They have chosen to revive the indefensible practices of pre-*Brown* days (*Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180]) when skin pigmentation and ethnicity were the qualifications that determined a child's school. They have rejected the plea of Justice Harlan in *Plessy* v. *Ferguson* (1896) 163 U.S. 537 [41 L.Ed. 256, 16 S.Ct. 1138], for a colorblind America, the rallying cry for civil rights martyrs from Wil-

*Assigned by the Chairperson of the Judicial Council.

liam Lloyd Garrison to Martin Luther King. They have also inadvertently resurrected two of the most universally discredited cases in modern American legal history: *Korematsu* v. *United States* (1944) 323 U.S. 214 [89 L.Ed. 194, 65 S.Ct. 1375], and *Hirabayashi* v. *United States* (1943) 320 U.S. 81 [87 L.Ed. 1774, 63 S.Ct. 1375]. (See, e.g., Rostow, *The Japanese American Cases—A Disaster* (1945) 54 Yale L.J. 489.) In those two wartime cases, the high court legitimated the use of race as a basis for governmental action and as a result it allowed the government to stigmatize an entire race by assuming the disloyalty of all of its members. In *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733], the opinion of Justice Powell, upon which the majority rely, approved race as a factor that may be considered in school admissions, citing *Korematsu* and *Hirabayashi* as authority for the proposition that not all racial or ethnic classifications "are per se invalid."

The approval of consideration of race as a factor in public education is in stark contrast to the enlightened views of the then majority of this court more than three decades ago, prior to emergence of the civil rights movement. In invalidating the state's miscegenation statute, Justice Traynor observed that the "right to marry is the right of individuals, not of racial groups. The equal protection clause of the United States Constitution does not refer to rights of the Negro race, the Caucasian race, or any other race, but to the rights of individuals . . . the constitutionality of state action must be tested according to whether the rights of an individual are restricted because of his race." (*Perez* v. *Sharp* (1948) 32 Cal.2d 711, 716 [198 P.2d 17].) To the contention that racial characteristics may be a factor in measuring rights, Justice Traynor wryly observed that "Human beings are bereft of worth and dignity by a doctrine that would make them as interchangeable as trains." (*Id.,* p. 725.) If the right to marry is the right of individuals, not of racial groups, a fortiori the right to become an educated person through a public school is strictly individual and not subject to approval or rejection because of ethnic characteristics.

The Traynor opinion in *Perez* was not an aberration. Until a newly constructed majority prevailed in *Price,* this court had consistently maintained that race or similar characteristics are not a qualification or disqualification for the benefits of society. Chief Justice Gibson declared in *James* v. *Marinship* (1944) 25 Cal.2d 721, 739 [155 P.2d 329, 160 A.L.R. 900], that racial discrimination in admission to union membership is "contrary to the public policy of the United States and this

state." In *Hughes* v. *Superior Court* (1948) 32 Cal.2d 850, 856 [198 P.2d 885], affirmed (1950) 339 U.S. 460 [94 L.Ed. 985, 70 S.Ct. 718], Justice Schauer wrote for this court: "because race and color are inherent qualities which no degree of striving . . . could meet, those persons who are born with such qualities constitute, among themselves, a closed union which others cannot join. It was just such a situation—an arbitrary discrimination upon the basis of race and color alone, rather than a choice based solely upon individual qualification for the work to be done—which we condemned in the *Marinship* case." Again in *Sei Fujii* v. *State of California* (1952) 38 Cal.2d 718, 733 [242 P.2d 617], Chief Justice Gibson declared, in striking down the alien land law, that the Constitution could not permit "a classification which operates to withhold property rights from some aliens, not because of anything they have done or any beliefs they hold, but solely because they are Japanese and not French or Italian." In the same case, Justice Carter discussed at length the fallacy "that the race or nationality of a person is a proper basis for the classification of those who are ineligible to own land or other property." (*Id.*, p. 752.) And recently in *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 475 [156 Cal.Rptr. 14, 595 P.2d 592], Justice Tobriner wrote for a majority of this court that an arbitrarily discriminatory employment policy favoring heterosexuals over homosexuals violated article I, section 7, subdivision (a), of the California Constitution. The foregoing judicial harbingers of a prejudice-free society are now sacrificed on the altar of a new race-consciousness that subordinates the merit of the individual to the common denominator of all who share his or her ethnicity.

The majority opinion is based primarily on a belief that the admission policy at Davis does not on its face offend the federal Constitution. It conveniently overlooks (a) provisions of the California Constitution which are violated by a race-conscious scheme, and (b) facts which demonstrate that the Davis policy, even if some persons may believe it to be constitutional on its face, is unconstitutional as applied.

Justice Paras ably pointed up the state constitutional issue for the Court of Appeal in this case. He wrote, inter alia: "Since here the University's admissions program does not use quotas, it does not violate the Fourteenth Amendment's equal protection clause as viewed by the federal *Bakke* majority. That does not however end our inquiry, for the California Constitution must also be consulted to determine whether the trial court's decision can and should be supported on independent

state grounds (cf. *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 760-768 [135 Cal.Rptr. 345, 557 P.2d 929]). As earlier noted the trial judge rested his decision on the Fourteenth Amendment, and also on California Constitution, article I, section 7, which provides: '(a) A person may not be deprived of life, liberty, or property, without due process of law or denied equal protection of the laws. [¶] (b) A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. Privileges or immunities granted by the Legislature may be altered or revoked.'

"Most recently in *People* v. *Pettingill* (1978) 21 Cal.3d 231, 248 [145 Cal.Rptr. 861, 578 P.2d 108], our Supreme Court summarized the independent state grounds doctrine as follows: 'The standard to be applied in resolving this issue is also now settled: "in the area of fundamental civil liberties—*which includes* not only freedom from unlawful search and seizure but *all protections of the California Declaration of Rights*—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is California law and the full panoply of rights Californians have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental civil rights are persuasive authority to be afforded respectful consideration, but are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law." ([*People* v.] *Longwill*, at p. 951, fn. 4, of 14 Cal.3d [123 Cal.Rptr. 297, 538 P.2d 753]; accord, *Serrano* [v. *Priest*], at p. 764 of 18 Cal.3d; [*People* v.] *Hannon*, at p. 606 of 19 Cal.3d [138 Cal.Rptr. 885, 564 P.2d 1203].)' (Italics added.)

"Section 7 of article I, is of course included in California's declaration of rights. And even though the right to an education, the subject of our inquiry, is not *expressly* guaranteed by our Constitution, it is nonetheless 'a fundamental interest' (*Serrano* v. *Priest, supra,* 18 Cal.3d at p. 766), as to which '[i]n applying our state constitutional provisions guaranteeing equal protection of the laws we shall continue to apply strict and searching judicial scrutiny ...' (*id.,* at p. 767); it is among 'those individual rights and liberties which lie at the core of our free and representative form of government' (*id.,* at pp. 767-768)."

For the foregoing reason and those stated in this court's six-to-one opinion in *Bakke* v. *Regents of University of California* (1976) 18

Cal.3d 34, 49 [132 Cal.Rptr. 680, 553 P.2d 1152] (as affd. in substance in *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733]), and since classification by race is involved, we are governed by the rule of strict scrutiny. The burden shifts to the state to establish that the use of a racial classification serves a compelling university interest, and that strict scrutiny reveals no reasonable way to achieve the state's goals by means which impose a lesser limitation on the persons disadvantaged by the classification. There can be no doubt that there are persons disadvantaged by the Davis scheme, i.e., those who are not Asian, black, Chicano, native American or Filipino—in other words, a majority of the residents of our state are disadvantaged. As will appear, in my opinion the state has failed to meet its burden. The university admission program is of dubious validity on its face, and the evidence is overwhelming that it totally fails as applied.

In attempting to meet its burden of proving a compelling state interest, the Davis administration initially denies it gives preferential treatment on the basis of race; it contends that ethnicity is only one factor considered in admissions. Obviously no one takes that sophistry seriously, least of all my colleagues. Indeed, they concede that "the University-has placed considerable weight upon racial or ethnic factors" but insist nothing prohibits such a practice. They proceed to offer three conflicting theories purporting to justify giving preference to minority applicants.

The majority opinion raises the issue of "disproportionate underrepresentation of minorities" at Davis. This is a strange new concept that is creeping into legal literature as an apologia for preferential treatment of applicants to public institutions. No one has cited any constitutional authority that requires or permits some kind of statistical parity among applicants on the basis of race, color, sex or national origin; if there can be no proportionate representation, it seems obvious there can be no disproportionate underrepresentation. No valid formula has been devised to ascertain out of every 100 admittees how many should be male or female; black or white; Catholic, Protestant, Jewish or Buddhist; German, Irish, Italian, Japanese, Mexican, Russian or Swedish. Indeed any such formula would make a mockery of the traditional democratic theory of selection on the basis of individual merit. And it would violate the condemnation of quotas in Justice Powell's opinion in *University of California Regents* v. *Bakke, supra*, 438 U.S. 265, upon which the majority heavily lean.

A second, presumably alternative rationale for preferential treatment is reparation for past societal discrimination against ethnic minorities. This theory conceivably would be justified on an individual basis if (a) the minority applicants personally had been the victims of educational discrimination, and (b) the rejected majority applicants, including De-Ronde, had personally committed or had been the beneficiaries of acts of discrimination. There is no evidence of either, let alone both, of those elements.[1] There is, as Professor Bernard Meltzer put it in a related context, an "absence of an individuated connection between remedy, on the one hand, and benefit and injury, on the other . . . ." (Meltzer, *The Weber Case* (1980) 47 U.Chi.L.Rev. 423, 433.) The burden falls only on those "who have no demonstrable connection to the wrong being redressed." (Kitch, *The Return of Color-Consciousness to the Constitution: Weber, Dayton, and Columbus* 1979 Sup.Ct.Rev. 1, 11.) Professor Kitch raises this concern: "Will this not be a particular problem for the young, who, having grown up on this side of the civil rights revolution, disassociate themselves from the racism of the old America, and may be surprised to learn that they are asked to pay for it?" (*Id.* at p. 13.)

A third alternative theory in the vain effort of the university to meet its burden is the purported desire to achieve diversity in the student body. With mere superficial consideration that concept may seem beguiling. It does not, however, withstand strict scrutiny.

I assume that not even a fanatical advocate of the modern racism would insist that achieving a diverse student body takes precedence over freedom of speech, freedom of religion, freedom of assembly, or the right to due process. Why, one is impelled to ask, should that asserted academic goal—even if desirable—assume a higher priority than the constitutional guarantee of equal protection? This selectivity over which constitutional guarantees are to be preserved, and which sacrificed, arrogates to an elite academic committee an awesome power never previously countenanced.

---

[1] The incongruity of group reparations rather than individual appraisal can be illustrated by the recent black appointee to President Reagan's cabinet as Secretary of Housing and Urban Development: Samuel Riley Pierce, Jr., the son of a prosperous businessman, resident of a fashionable New York suburb, honor graduate of an Ivy League University. Would Davis be justified in rating Secretary Pierce's offspring, because of their color, more deserving of preferential treatment than the offspring of a Caucasian farm worker from the Imperial Valley, a Yugoslav fisherman from San Pedro, or an Italian cobbler from San Francisco's North Beach?

Professor Alan Dershowitz of Harvard has pierced the facade known as the diversity rationale for preferential treatment of admission applicants. "The incredible staying power of the 'diversity-discretion' model is due as much to the model's marvelous ability to mask genuine institutional criteria, which cannot or will not be publicly articulated, as it is to any deep-seated belief in the value of diversity as an educational desideratum .... The *raison d'etre* for race-specific affirmative action programs has simply never been diversity for the sake of education. The checkered history of 'diversity' demonstrates that it was designed largely as a cover to achieve other legally, morally, and politically controversial goals .... The 'diversity-discretion' model thus subverts the ideals of responsibility and candor that are the hallmarks of any institution of learning in an open and democratic society." (Dershowitz & Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext?* (1979) 1 Cardozo L.Rev. 379, 404, 407.)

As Professor Dershowitz points out, even if diversity were a significant factor in enhancing the educational process—which is dubious—it would not follow that race adds to that diversity. "An applicant's potential ability to contribute to the diversity of the student body is uniquely a function of his or her *individual* experiences, interests, approaches, talents, and characteristics. The prep school black brought up in a middle-class neighborhood by professional parents might contribute far less diversity than a Hasidic Jew from Brooklyn, a Portuguese fisherman from New Bedford, a coal miner from Kentucky, or a recent emigre from the Soviet Union." (*Id.*, p. 419; see also fn. 1, *ante*.) He therefore found the conclusion inescapable that to give members of a minority race a preference in admissions is simply to reward them for the accident of their race, a fact that has no relevancy to the purported goals of education for service in a profession. In addition, "To reward some persons for the accident of their race is inevitably to punish others for the accident of theirs." (*Id.*, pp. 420-421.)

Finally, there are untried alternative and less drastic methods to achieve the goals purportedly sought by the university. If Davis genuinely seeks to aid those who need assistance in obtaining a professional education, it need not resort to the device of weighing race as a factor, either to favor those of certain specified races or to penalize those who are not included in the preferential categories. For example, Davis could consider the type of program undertaken at Temple University Law School, which in its enrollment weighs consideration "'for the dis-

advantaged, whatever their color or ethnic background, who show exceptional promise.' ... '[P]laces are open to just about anyone who can demonstrate that he or she has overcome some significant deprivation, whether it is poverty, language or blindness.'" (Dershowitz, *op. cit. supra*, p. 423, fn. 132.)

Under that type of program, opportunities open up equally for all victims of deprivation: the black from the inner city, the Chicano from the farm fields, the oriental refugee from Asian communism, the Caucasian whose parents speak a foreign language at home, the student of any ethnic heritage who has conquered physical disability or whose family has existed below the poverty level. The actual handicap or adversity overcome may be a factor in admission consideration, not the color of skin or the surname.[2]

Since none of the theories advanced by the university, and accepted by the majority, meet the burden of the strict scrutiny test, I conclude the admission scheme is unconstitutional under the equal protection clause of the California Constitution, i.e., article I, section 7, subdivisions (a) and (b). We need go no further. Nevertheless I point out in addition that the university admission policy is also unconstitutional as applied. (*Brock* v. *Superior Court* (1939) 12 Cal.2d 605 [86 Cal.Rptr. 805]; *Startrack, Inc.* v. *County of Los Angeles* (1976) 65 Cal.App.3d 451 [135 Cal.Rptr. 283].)

The majority, in their reliance on the opinion of Justice Powell in the federal *Bakke* case, appear to accept the university's contention that race is merely one isolated, presumably minor factor in the selection process. The facts are otherwise. The plaintiff presented persuasive evidence that the Davis admissions committee was predisposed to place undue emphasis upon race. Four of the six members of the committee not only were of minority ethnic backgrounds themselves but also were or had been active in organizations dedicated to increasing the number of admittees from their particular racial group. Under the circumstances the committee's objectivity was suspect at the outset.

When to that predisposition are added the figures of actual admissions to Davis for the year when plaintiff applied, and for the

---

[2]The Harvard program, mentioned with approval by Justice Powell and the majority of my colleagues, is not the paradigm it is represented to be. For a criticism of the Harvard scheme as applied, see Dershowitz, *op. cit. supra*, page 379 ff. Harvard, unlike Davis, does not specify preferred races.

immediately preceding years, a clear discriminatory pattern emerges. The DeRonde year was 1975-1976. For that school term 1,117 white males applied for admission; 156, or 14 percent were accepted. At the same time, 494 minorities applied; 142, or 29 percent, were accepted. Thus nearly 48 percent of the entering class was comprised of minorities.

The foregoing would be unobjectionable if the selected minority members were distinguished by criteria other than race. Again, the facts, regrettably, are otherwise. The mean Law School Admissions Test (LSAT) score for minorities was 562, for white males 676, an average of 114 points higher. The mean grade point average (GPA) for minorities was 3.27, for white males 3.57.

For previous years, the figures are even more disparate. In 1972, only 5 percent of white male applicants and 7 percent of white female applicants were admitted, compared with 33.6 percent of minority applicants. In 1973, the figures were 8 percent of white male applicants and 6 percent of white female applicants, compared with 26 percent of minority applicants; in that year the mean LSAT was 565 for minority admittees compared with 692 for white male admittees, and 3.17 GPA for minorities compared with 3.43 for white males.

If more minority applicants, even though less qualified, could be admitted without impacting on others better qualified, we could remain unconcerned. But the disparate figures, year after year, have had a significant cumulative effect on the student body demography. In 1969-1970, the minority percentage of the total student population was 13.1 percent. By 1972-1973 the minority percentage rose to 41.6 of the entire student body. Again I stress that the increase would be laudable if, absent consideration of race, the minority admittees had equal objective qualifications, but the figures demonstrate otherwise. Thus while whites generally and white male applicants particularly scored consistently higher on the LSAT and GPA, their representation in the whole Davis student body decreased in a mere three years from 86.9 percent in 1969 to 58.4 in 1972. This demonstrates that race was the most important factor in admission decisions and, I submit, constitutes invidious discrimination, based on race, against whites generally and white males in particular. The circumstantial evidence is overwhelming that this overt discrimination has been practiced deliberately by the admissions committee acting for the administration of this tax-supported university.

The evidence further includes the following: 74 persons were admitted with lower credentials than this plaintiff, 72 of them minority applicants. In the lower third of the class—an index figure of 2.63 down to 2.24—57 admittees were selected, all of them minority applicants, although 1,400 better qualified Caucasians, including plaintiff, were rejected.

Thus the trial court was in error in finding from the evidence that plaintiff would not have been admitted even absent the school's race-conscious program. The plaintiff graduated from Davis as an undergraduate with a 3.47 GPA, 575 on the LSAT and a predicted first year average of 2.70, higher than 72 ethnic minorities admitted. His LSAT was higher than 88 admittees, 78 of whom were minorities. His writing ability score was higher than 36 admittees, 33 of whom were minorities. It seems clear that without the preferential treatment of applicants —acceptance of some and rejection of others on the basis of race—this plaintiff would have been included among the successful applicants in 1975.

There are other relevant matters relating to the unconstitutionality of the Davis scheme as applied. The choice of the particular races entitled to preferential treatment is itself suspect. There is every indication that the races to be included in the preferential group, and those excluded, are determined to a considerable extent by responsiveness to the pressure emanating from well-intentioned but self-serving organizations. For example, no ethnic group in our society is better adjusted, completely accepted and more successful academically and economically than Asian-Americans.[3] Let me emphasize that I relate this with profound admiration, in view of the tragic record of past legal and extralegal discrimination against those in earlier generations who came or were brought here from the orient. (E.g., see Chuman, The Bamboo People: The Law and Japanese-Americans (1976) p. 72 ff.) The United States Commission on Civil Rights reports that as of 1970 only 13.5 percent of majority males in the United States had completed at least four years of college, but 19 percent of Japanese-American males, 25 percent of Chinese-American males and 15 percent of Filipino-American males had a college education. Among females, the percentages of college educated were 8.1 percent for the majority, 11 percent for Japanese-Americans, 17 percent for Chinese-Americans and 27 percent for

---

[3]Sowell, *Ethnic Groups, Prejudice and Economic Progess* (Dec. 4, 1980) Wall Street Journal.

Filipino-Americans. Even among the lesser numbered groups, the percentages of college-educated exceeded that of the majority: 36.2 of Korean-Americans, 24.4 percent of the new arrivals from Vietnam. (U.S. Commission on Civil Rights, Success of Asian-Americans: Fact or Fiction? (Sept. 1980) pp. 3-4.)

Economically, Asian-Americans are doing very well.[4] While the mean annual income of employed persons reported for the preinflation year 1970 for majority males was $7,375, it was $8,183 for Japanese-Americans, $7,553 for Korean-Americans, and only slightly less for Chinese-Americans and Filipino-Americans. Every group of employed Asian-American females earned more than Caucasian females (*id.*, p. 11).

None of the foregoing would suggest to any objective observer that Asian Americans require preferential treatment in publicly financed schools of higher learning. Why, then, are they included as a favored racial group? There is a hint of the answer in the Commission on Civil Rights publication cited above. When the Solicitor General filed a brief for the government in the federal *Bakke* case, he raised questions as to whether Asian Americans should be included in the Davis quota. The government's position was changed prior to oral argument, the commission concedes, as the result of "extensive lobbying efforts," including remonstrations with both the Justice Department and the White House (*id.*, pp. 22-23).[5]

I do not intend to single out Asian Americans for comment on pressure activities. Every ethnic group engages in similar efforts to assure its inclusion among those who are to be given preferential treatment, and few political, academic—and more recently, judicial—institutions

---

[4]Blacks, too, have experienced remarkable economic growth without special preferences. Ben J. Wattenberg has written that by 1970, "for the first time in the history of the Republic 'middle class'—as measured by criteria of income, occupation, and education—became the adjective to describe the majority of black Americans." (Wattenberg, The Real America (1976) p. 124; see also Rossum, Reverse Discrimination (1980) p. 32 ff.)

[5]Theologian Michael Novak suggests that ethnic inclusion is a matter of political pressure. While abhorring group entitlement and quotas, he declares that "if the Poles, Czechs, Italians and others are not considered 'official minorities,' it is because they haven't been as skillful in politics as they need to be . . . if society wants quotas, then everyone should be included." (See Novak, *Ethnicity is Not a Dirty Word* (Summer 1980) Civ. Rights Q., pp. 24-25.)

appear to be forthright enough to withstand such importunity.[6] On many a campus, a combination of demonstrations, picketing, pamphleteering, sit-ins, walk-outs, and similar agitation—including demands to actually select admittees—by students and nonstudent sympathizers, appears generally and in this instance to have induced the administration to neglect its responsibility to operate a tax-supported institution on a basis of equal rather than preferential treatment.

The briefs submitted in this case are interesting; they reveal how well-meaning organizations will proclaim devotion to principle, but rise above principle when an opportunity for advantage appears. An amicus brief has been submitted by a group entitled Chinese for Affirmative Action, which declares itself dedicated for more than a decade to the laudable objectives of "eradication of racial discrimination against Chinese in America and for the promotion of *equal* opportunities for all minority groups." A similar amicus brief has been submitted by the Asian American Legal Defense and Education Fund, which declares it was formed to protect Asian Americans in "the right to *equal* educational opportunity." And the Mexican-American organizations' brief (on behalf of the Mexican-American Legal Defense and Educational Fund, the National Chicano Council on Higher Education, the Association of Mexican-American Educators, Raza Administrators and Counselors in Higher Education, the League of United Latin American Citizens, and the National Council of La Raza) indicated their purpose in existing is "the goal of *equal* educational opportunities for Hispanics." So, too, has a letter brief from the Native American Law Student Association declared its devotion "to *equal* educational opportunities" for Native Americans and other minorities. (Italics added.) It is significant that every organization purporting to speak for minorities concedes it was formed to press for *equal* opportunity in education. Not one was organized to demand, as is being sought here, *preferential* consideration on the basis of race.

With sadness one observes how far these groups have strayed from the wisdom of the great American, Frederick Douglass, born in slavery: "I base no man's right upon his color and plead no man's right because

---

[6]Professor Bunzel cites a member of Congress who "acknowledged that in the area of affirmative action many of the decisions and policies of the courts and federal agencies do not reflect the feelings of the majority of Americans and have gone beyond the intent of Congress. When asked why he did not draw attention to the problem, he answered candidly, 'I do not want to be called a racist by the civil rights activists.'" (Bunzel, *Prepared, Not Preferred* (Fall/Winter 1980) Stan. Magazine, p. 60.)

of his color." (4 Foner, The Life and Writings of Frederick Douglass (1955) p. 117.) And from Justice Frankfurter, who declared that in the law what mattered "'was excellence in your profession, to which your father or your face was equally irrelevant.'" (Meserve, *The Quality of Intellectual Competition* (1973) 25 J.Leg.Ed. 378, 383.)

Although it is improper for government or public institutions to allocate upon ethnicity, I emphasize that it is proper in our diverse society for groups to perpetuate their ethnic culture and racial identity. The danger arises when ethnic pride gives way to ethnic chauvinism and ultimately to ethnic demagoguery.

The Governor and several members of his administration have also filed an amicus brief, concluding with the contention that "the First Amendment right to a diverse student body" must prevail over the equal protection clause of the state Constitution. That the First Amendment creates some implied enforceable "right to a diverse student body" will come as a surprise to constitutional scholars. That such a nebulous "right," newly constructed for this litigation, takes precedence over the right of all persons in California to be accorded equal protection and privileges must be rejected as completely untenable. Despite the views expressed in that brief, one would hope that equal protection is alive and well, and still enjoys a high priority, in contemporary California.

Finally, an amicus brief has been submitted in support of the university by the American Civil Liberties Union (ACLU). It raises remarkable arguments based on "equality, academic freedom and independent interpretations of state constitutions." The contentions are irreconcilable with logic, for it is plaintiff DeRonde who asserts he is a victim of inequality and academic obfuscation—not the university—and the Court of Appeal, the opinion of which is superseded by the majority, relied entirely upon the California Constitution. The ACLU, as it did in its unsuccessful attempt to frustrate Alan Bakke's efforts as an individual to win admission to medical school, has once again chosen the uncharacteristic role of supporting an establishment program based on recognition of group characteristics and values as opposed to the right of persons to be treated and evaluated as individuals.

A program of race-consciousness necessarily arouses divisive debates over purported group characteristics. An attitude of racial superiority is candidly expressed by admissions officers of some law schools. The following excerpts from a legal publication (L.A. Daily J. (Nov. 24,

1980)) reveal a typical policy in defense of special treatment and preferential admissions:

"'If we can't have an affirmative action program we would radically reduce the number of minority students we could have,' said . . . the admissions director at Boalt Hall School of Law in Berkeley. [¶] Last year, Boalt admitted 67 minority students into its entering class. But only seven of those students would have been admitted without an admissions policy that allows a discount on test scores and grades for minority applicants. . . . [¶] 'In the highly competitive process for admission to this school, *if those students were not given some special consideration it's unlikely that they could survive that competitive process.'*" (Italics added.)

The foregoing program raises a basic question: when the number of available admissions in a public institution is limited, in a constitutional society is there any rational reason to prefer those who cannot survive the competitive process over those who do survive that process? It should be readily apparent that such *preference* cannot be reconciled with principles of *equal* protection.[7]

As Professor John Hart Ely posed the issue in his book Democracy and Distrust (1980), page 170: "no matter what we call it—a preference, a quota, a quest for diversity—weighing, say, blackness affirmatively necessarily means that others are going to be denied the opportunities in question because they were not born black." And again he observed that "any affirmative action plan that counts blackness affirmatively, even in the context of numerous other factors, necessarily results in the rejection of some applicants who would not be rejected were they black, and in that sense are being turned away 'only' because they are not black." (*Id.* at p. 257, fn. 102.)

---

[7] A logical extension of racial representation in public schools was proposed recently in Cleveland. The administrator of the school district's integration program observed that most high school basketball teams in the community were all-black. Integration, he decided, must be a two-way street. Therefore he ordered that by next year two out of five first-team players must be white.

Coaches, and black players particularly, complained bitterly that the principle of ability was being overlooked, that racial representation and quotas should not replace merit in selection of a competitive team.

A federal judge ultimately vetoed this absurd scheme.

Los Angeles high school coaches commendably reacted to the suggestion this way: "We try not to think in terms of the ethnic situation. We play the people who are going to get the job done, regardless of color." (*Integration Plan Isn't Likely Here* (Dec. 9, 1980) L.A. Times, pt. III, p. 6.)

Since the Reconstruction era, the Constitution has assured all persons that they would receive *equal* protection. The concept of *preferential treatment* is contrary to those fundamentals that inspired the unique greatness of the United.States. Even more devastating, any scheme involving preference to some races contains the clear message that members of those races are inferior and unable to compete on a basis of equality. The implication in the rationale of the university that whites are inherently superior, other races inherently inferior, and that unless special benefits are given to minority races institutions will inevitably become all-white, brings back haunting memories of the "master race" that most Americans hoped had been forever eliminated by the Second World War.

Theories of master racism are inherently evil, whether evidenced by Nazi Germany's genocide of a religious minority, white-controlled South Africa's apartheid program aimed at a racial majority, or black-controlled Uganda's expulsion of an Indian minority. In the final 2 decades of the 20th century it is incongruous for racism in any guise to creep by stealth into American academia, and to be not only abjectly accepted, but now stoutly defended. If the principles of democracy and constitutional equal protection are not recognized in the intellectual environment of taxpayer-supported institutions of higher learning, perhaps one should not be so incredulous when some judges are willing to blindly acquiesce in public benefits being bestowed or withheld in whole or in part on the basis of race.

One of the tragedies of history is that courts of law have placed their stamp of approval on racism. In *People* v. *Hall* (1854) 4 Cal. 399, our predecessors on this court upheld a statute that prohibited "black, yellow and all other colors" of persons, whom "nature has marked as inferior," from testifying against whites.

But the cases that will endure, that will pass the test of time, are not those that emphasize race as a benefit or detriment, but those that totally exclude race as a consideration in determining rights. One may ask, rhetorically, which opinion will enjoy the plaudits of posterity, *Brown* v. *Board of Education*—which took racial factors out of the public schools—or the majority opinion in *Plessy* v. *Ferguson*—which permitted separation on a basis of race? It seems equally inevitable that the perspective of time will relegate *Price*, which approved a mathematical racial quota in public employment, to the same historical ashheap that contains such cases emphasizing race as *People* v. *Hall, supra,*

*Fong Yue Ting* v. *United States* (1893) 149 U.S. 698 [37 L.Ed. 905, 13 S.Ct. 1016], and *Quock Ting* v. *United States* (1891) 140 U.S. 417 [35 L.Ed. 501, 11 S.Ct. 733, 851].

Opinions such as the majority in this case are, like *Price*, a radical departure from the spirit of the Constitution of California, which declares that all persons are entitled to equal protection of the laws. The new rule is that what you get depends upon what you are. It is a return to the medieval notion of government by status—and race is a status over which no one has any control. Race cannot be a plus among qualifications, for if it is a plus for some in our society it is necessarily a minus for others. It is arithmetically impossible for race as a factor to be neutral. Its inclusion as a benefit to some constitutes a detriment to those unable, merely by the accident of birth, to enjoy the same advantage. In short, the use of race in the distribution of society's benefits is a form of racism, the anachronistic concept that brains and the ability to use them are related to race.

In a society in which men and women expect to succeed by bettering themselves through individual industry—the traditional work ethic—it is no trivial moral wrong to systemically defeat this expectation by subjecting them to group scrutiny. Any system guilty of rejecting an applicant for public school admission when he or she excels in meeting established objective requirements, in favor of others who are less qualified by the same standards, is immoral; it is also self-defeating in the long run because of its acceptance of mediocrity.[8] One can only hope that ultimately this new egalitarianism will be rejected because, as Barbara Tuchman recently wrote, "the urge for the best is an element of humankind as inherent as the heartbeat."[9]

Years ago medical doctors attempted to cure morphine addiction with doses of heroin. Such efforts were doomed to failure, and worse.

---

[8]The federal bureaucracy has been compelled to recognize the inefficiency resulting from racially inspired hiring policies. "The emphasis on race or sex rather than performance, and the explicit rules and implicit fears by which it is enforced, can wreak havoc in a large organization even after the initial hiring decision is made .... [T]he atmosphere created by defining people in terms of race heavily burdens the possibility of decent working relationships." (Reed, *What's Wrong With Affirmative Action* (Jan. 1981) Wash. Monthly, pp. 28-29.)

[9]Tuchman, *Quality and Non-Quality*, San Francisco Chronicle, Review section, (Nov. 16, 1980). Also see Fallon, *Merit Conceptions & Antidiscrimination Law* (1980) 60 B.U. L.Rev. 815.

Today the university is attempting to cure the remnants of discrimination against minorities with programmed discrimination against the majority. The failure of this misguided social homeopathy is equally predictable. Discrimination—for or against any group—is addictive; the belief that it can be temporary, limited, or controlled is naive and self-deluding.

I quoted Professor Van Alstyne's peroration in my *Price* dissent. It bears repetition: "one gets beyond racism by getting beyond it now: by a complete, resolute, and credible commitment *never* to tolerate in one's own life—or in the life or practices of one's government—the differential treatment of other human beings by race. Indeed, that is the great lesson for government itself to teach: in all we do in life, whatever we do in life, to treat any person less well than another or to favor any more than another for being black or white or brown or red, is wrong. Let that be our fundamental law and we shall have a Constitution universally worth expounding." (Van Alstyne, *Rites of Passage* (1979) 46 U.Chi.L.Rev. 775, 809-810.)

I would affirm the order of the trial court insofar as it holds the university admissions procedure to be invalid and enjoins the university from utilizing admissions criteria based upon color, sex, race, religion or ethnic origin. I would reverse the order of the trial court denying plaintiff's application for a writ of mandate and denying plaintiff's motion to amend his complaint.

Clark, J., concurred.

The petition for a rehearing was denied March 11, 1981, and the dissenting opinion was modified to read as printed above. Newman, J., did not participate therein. Rattigan, J.,* participated therein. Mosk, J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.