[Civ. No. 39033. First Dist., Div. Two. Mar. 29, 1982.]

RAYFORD R. HIATT et al., Plaintiffs and Appellants, v. CITY OF BERKELEY et al., Defendants and Appellants.

COUNSEL

Carroll, Burdick & McDonough, Ronald Yank and Christopher Burdick for Plaintiffs and Appellants.

Allan Yannow, Arnold Forster, Jeffrey Sinensky and Richard Weisz as Amici Curiae on behalf of Plaintiffs and Appellants.

Dennis A. Lee, Acting City Attorney, and Charles O. Triebel, Jr., for Defendants and Appellants.

OPINION

ROUSE, Acting P. J.—Plaintiffs, employees of the Berkeley Fire Department (hereafter respondents), brought this action against the City of Berkeley, its City Council, and certain city officials (hereafter collectively appellants), challenging the promotional procedures laid down in the city's Affirmative Action Program (hereafter AAP). Respondents invoked the Fourteenth Amendment of the United States Constitution, article I, section 21 (now § 7) of the California Constitution, 42 United States Code, sections 1983, 2000d, 2000e-2 (Civil Rights Act of 1964), and California Labor Code section 1420 et seq., claiming that the attacked provisions of AAP set up rigid quotas in hiring and promoting city employees which were based solely on race or sex and therefore violated both the constitutional principles of equal protection of laws and the provisions of the Civil Rights Act of 1964 proscribing discrimination premised on race, color, national origin or sex. After trial, a judgment and permanent injunction were issued in favor of respondents. The appeal is taken from the judgment awarding damages to respondents and enjoining City of Berkeley from enforcement of certain provisions of AAP; the cross-appeal is from a denial of attorney's fees and a refusal to promote two of the respondents.

We filed an opinion in which (as modified), we concluded that the judgment should be reversed in three specified respects but should

otherwise be affirmed.[1] The Supreme Court granted a hearing and then retransferred the cause to this court for reconsideration in light of *Price v. Civil Service Com.* (1980) 26 Cal.3d 257 [161 Cal.Rptr. 475, 604 P.2d 1365]; and *Steelworkers v. Weber* (1979) 443 U.S. 193 [61 L.Ed. 2d 480, 99 S.Ct. 2721]. We granted leave to the parties and to an amicus curiae to file supplemental briefs; we have received and considered the briefs. Upon full reconsideration, we reaffirm the conclusions we reached initially.

### Background Facts

AAP, the centerpiece of the legal dispute, was adopted by the City of Berkeley in 1972 pursuant to City Council Resolution No. 45,257-N.S., and was amended in 1974 in order to conform to the 1970 census figure. The stated goal of AAP is to achieve and maintain "proportional employment" for all minorities[2] in each city department, job classification, and salary category. In the definition of AAP, proportional employment means that "the percentage of each race and sex in the City of Berkeley work force shall be approximately equal to that of the percentage of each race and sex in the Berkeley population as a whole."

In order to attain the stated goal, AAP introduced a wide ranging, elaborate program which purported to base the city's employment practices solely on race and sex rather than on competitive, free examinations and merit as prescribed by the city charter (see discussion, *infra*). Thus, at the very outset AAP declared that "The 'minimum qualifications' principle shall guide the establishment of job requirements for all City job classifications." AAP then provided that the personnel department shall use written tests on a nonranking basis only, and the qualification of the applicants shall be determined on the results of oral interviews. AAP made it mandatory that the interview panels include at least one minority person and one woman; while at the same time it precluded the panel members from eliciting information regarding the applicant's test scores, performance appraisals, sick leave record and/or previous disciplinary actions. AAP next provided that the employment lists be restricted to three general categories ("Outstanding," "Well Qualified," and "Qualified"), and that the names of the candidates in

---

[1]The author of that opinion, Associate Justice Robert F. Kane, has since retired from the court, hence did not participate in this opinion.

[2]Pursuant to AAP, "minorities" include Asian, Black, Spanish, American Indian and other nonwhite persons of both sexes, and white females.

each qualifying category be listed in alphabetical order rather than according to the actual test scores achieved on the examinations. AAP also ordered that the appointment register (a list of all qualified applicants taken from the employment list) be arranged in order of hiring priorities; that all future vacancies in the city's civil service be filled from the appointment register; that all applicants be interviewed and recommended in order of hiring priorities; and, most importantly, that vacancies in city service be filled on the basis of hiring priorities and underutilization, unless upon the request of the department head a waiver is granted by the city manager.

The most egregious, racially discriminative nature of AAP was demonstrated by the scheme under which the so-called "hiring priorities" and "underutilization"[3] were to be determined. For the purpose of achieving the overall policy goal of proportional employment, AAP set up a rigid quota system which worked as follows: First, AAP classified the city population by race and sex. Next, it required that the race and sex of the employees be ascertained within each department, job classification and salary category. As a following step, the percentage of race and sex was to be compared to the population of the City of Berkeley as a whole, as indicated in the census. If the percentage of a particular race or sex in a department, job classification or salary category was below its percentage in the Berkeley population, the group was deemed "underutilized" and became a priority group for hiring and promotion.

The present lawsuit grew out of the application of AAP in filling certain vacancies in the Berkeley Fire Department. As the record indicates, on or about June 5, 1974, there were four vacancies for the promotional position of fire captain and three for the job title of fire lieutenant. The city had eligibility lists with respect to both job categories. Contrary to the mandate of AAP, the lists were compiled on the basis of competitive examinations and contained a numerical ranking of the candidates based upon their performance in the examinations. The eligibility list for fire captain comprised nine names. Although respondents Hiatt and Rinne ranked higher on the list than Melvin E. Thompson, a minority candidate, Thompson was promoted to fire cap-

---

[3]AAP defines "underutilization" as having fewer minorities and women in a particular department, job classification or salary category than would be reasonably expected by their availability and representation in the Berkeley population.

"Hiring priority" is defined as that category of applicants which will receive emphasis in hiring, promotion, or transfer as determined by the most critical departmental and/or city-wide underutilization.

tain solely because of his race. The very same occurred with regard to the promotion of Clinton Beacham, a minority employee, to the position of fire lieutenant. The record affirmatively shows that despite the fact that Beacham ranked tenth in the group, and respondents Salter, Parks, Jones, Littley, Wolf and Leimone were more qualified and outranked Beacham, he was promoted solely on the basis of his race.

While it appears that a racial imbalance existed in the command structure of the fire department, the evidence introduced at trial indicated, and the superior court so found, that the City of Berkeley had not discriminated in the past on any occasion against any person on the ground of his or her race or sex concerning employment opportunities with the City of Berkeley in general or with its fire department in particular. The record likewise disclosed that the City of Berkeley had adopted AAP in recognition of a "history of discriminatory employment practices throughout all segments of American society" but AAP contained no legislative declaration of past discriminatory conduct on the part of the City of Berkeley itself.

Based upon the foregoing considerations, the trial court inter alia concluded that the promotions under challenge were made solely on the basis of race, and that lesser qualified persons were appointed to the positions of fire captain and fire lieutenant pursuant to the directives of AAP. The court also held that certain provisions of AAP directing or facilitating employee appointments or promotions on the sole basis of race or sex, rather than on merit, were unduly discriminatory and therefore violative of the constitutional and statutory provisions proscribing racial and sexual discrimination.[4] In accordance therewith, the trial court enjoined appellants: (1) from promoting any person except on the basis of eligibility lists established by open, competitive examination which shall reflect the scores achieved by the candidate on both the written and oral examinations as prescribed by city charter, article XVI, section 119; (2) from denying promotion to any person on the

---

[4]AAP provisions found unconstitutional by the court are as follows: (a) the "proportional employment" directives contained in AAP, especially the "Goals and Timetables" which set forth the percentage of the Berkeley population by race and sex and mandate parity in the work force; (b) the provisions that written tests be used on a nonranking basis; (c) the employment list policy which purports to emasculate the determination of ranking on an objective basis and puts the candidates in three large categories in alphabetical order; (d) the hiring priority policy based upon the concept of "underutilization" of work force; (e) the selection and "waiver" procedure which gives an absolute priority to the minorities in hiring, promotion, etc., unless a "waiver" is granted to eligible white males.

grounds of race, color, sex, national origin or ancestry or from granting any applicant for promotion any preference or advantage on the afore-stated bases; and (3) from adopting or implementing any personnel policy or system which fails to promote candidates on the basis of open, competitive and free examinations uniformly and fairly administered to each candidate.

## The Appeal

The trial court expressly concluded that in pertinent respects AAP conflicted with the equal protection clauses of both federal and California Constitutions, as well as with California Labor Code section 1420 and following, title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.), and section 37 of the Berkeley Charter. Appellants' broad attack on the propriety of the court's judgment implicitly chal-lenges each of the alternative conclusions on which the judgment was based: If any one of the alternative conclusions is correct, the judgment insofar as it enjoins the specified elements of AAP and awards damages to respondents should be affirmed. In this court, the parties have direct-ed their arguments primarily to the constitutional issues; it appears from the record that the trial proceedings were similarly focused. Mind-ful of "the traditional judicial inclination to avoid a constitutional ruling if a case can be resolved on nonconstitutional grounds" (*Price* v. *Civil Service Com., supra,* 26 Cal.3d 257, 268, citing *Ashwander* v. *Tennessee Valley Authority* (1936) 297 U.S. 288, 346-348 [80 L.Ed. 688, 710-712, 56 S.Ct. 466]), we nevertheless choose to follow the parties' lead and to address the constitutional issues at the outset. We conclude that the trial court's analysis of these issues was correct. Our conclusion renders unnecessary extended discussion of appellants' other conten-tions.

■ At the outset, we emphasize that while both the Fourteenth Amendment of the United States Constitution and the equal protection clause of the California Constitution, which was patterned after and "'substantially the equivalent'" of the language of the Fourteenth Amendment (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 596, fn. 11 [96 Cal.Rptr. 601, 487 P.2d 1241]; *McGlothlen* v. *Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005 [140 Cal.Rptr. 168]), accord any person the equal protection of the laws in plain and unequivocal lan-guage and without qualification,[5] it is well settled that different

---

[5]Section 1 of the Fourteenth Amendment provides that "All persons born or natural-ized in the United States, and subject to the jurisdiction thereof, are citizens of the

classifications of citizens, including classification by race, are not per se illegal, much less unconstitutional.

■ In order to test the validity of a classification, the courts apply a two-tiered system of analysis. Thus, it has been said that, in general, classifications made by government regulations are valid "if any state of facts reasonably may be conceived" in their justification (*McGowan* v. *Maryland* (1961) 366 U.S. 420, 426 [6 L.Ed.2d 393, 399, 81 S.Ct. 1101]). This yardstick, generally called the "reasonable basis" test, is used in a variety of contexts to determine the validity of the government action (*Village of Belle Terre* v. *Boraas* (1974) 416 U.S. 1, 8 [39 L. Ed.2d 797, 803-804, 94 S.Ct. 1536]; *Dandridge* v. *Williams* (1970) 397 U.S. 471, 485 [25 L.Ed.2d 491, 501-502, 90 S.Ct. 1153]). However, in certain circumstances a more stringent standard is imposed. Most notably, where the classification is based solely on the basis of race or sex, it is regarded as a *suspect* classification which is subject to strict judicial scrutiny (*Raffaelli* v. *Committee of Bar Examiners* (1972) 7 Cal.3d 288 [101 Cal.Rptr. 896, 496 P.2d 1264, 53 A.L.R.3d 1149]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; *People* v. *Rappard* (1972) 28 Cal.App.3d 302 [104 Cal.Rptr. 535]). This principle has recently been reaffirmed in *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733], a reverse discrimination case, where the United States Supreme Court emphatically pointed out that distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality (*Loving* v. *Virginia* (1967) 388 U.S. 1, 11 [18 L.Ed.2d 1010, 1017, 87 S.Ct. 1817]; *Hirabayashi* v. *United States* (1943) 320 U.S. 81, 100 [87 L.Ed. 1774, 1785-1786, 63 S.Ct. 1375]), and held that "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination" (*University of California Regents* v. *Bakke, supra*, at p. 291 [57 L.Ed.2d at p. 771]).

■ It follows that in the event the government classifies citizens with

United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State* deprive any person of life, liberty, or property, without due process of law; nor *deny to any person* within its jurisdiction *the equal protection of the laws.*" (Italics added.)

California Constitution, article I, section 7, sets out that "(a) *A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws.* [¶] (b) *A citizen or class of citizens may not be granted privileges* or immunities *not granted on the same terms to all citizens.* Privileges or immunities granted by the Legislature may be altered or revoked." (Italics added.)

regard to employment opportunities by virtue of their race, the legislation may be upheld only if it (1) is justified by a *compelling state interest*, and (2) is *necessary* for the furtherance of that compelling state interest (*Weber* v. *City Council* (1973) 9 Cal.3d 950, 959 [109 Cal.Rptr. 553, 513 P.2d 601]; *McLaughlin* v. *Florida* (1964) 379 U.S. 184 [13 L.Ed.2d 222, 85 S.Ct. 283]). Further, the classification must be designed to minimize its limiting effect upon the class to be burdened by the classification (cf. *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 343 [31 L.Ed.2d 274, 284-285, 92 S.Ct. 995]; *Shelton* v. *Tucker* (1960) 364 U.S. 479, 488 [5 L.Ed.2d 231, 237, 81 S.Ct. 247]; *University of California Regents* v. *Bakke, supra*, pp. 307-309 [57 L.Ed.2d at pp. 781-783]).

■ In the case at bench, the record clearly supports the trial court's finding that the classifications in AAP were based solely on the basis of race and sex. As a consequent, they are subject to strict judicial scrutiny. Accordingly, appellants were required to prove that the racial classifications contained in AAP were warranted by a compelling governmental interest, that the measures taken were necessary to implement the latter interest, and that the means to achieve the stated policy goal were so designed as to impose the least limitation on the rights of the affected majority. The trial court concluded that the pivotal provisions of AAP were in conflict with the equal protection guarantees of both federal and California Constitutions. The record supports the trial court's conclusion.

### 1. *Compelling State Interest*

To begin with, the record is notable for a complete lack of showing that the ultimate goal of AAP, namely, the attainment of proportional racial employment in the city work force in general and the work force of the fire department in particular, was compelled by, or was even reasonably related to, any legitimate legislative end, directly promotive of governmental efficiency, e.g., the enhancement of the employee's ability to perform his or her duty in a productive manner; or a greater efficiency of the work force as a whole by virtue of its racial restructuring; or establishment of a better rapport with minority persons in the community. Indeed, it stretches any imagination to assume or imply that a firefighter is better suited to his job just because he or she belongs to a certain race or sex or that a minority citizen would prefer a minority fireman to put out a fire at his or her house or that a minority employee of the fire department would, of necessity, establish better rapport with

minority communities. These assumptions are negated by the contrary findings of the trial court.[6]

Appellants argue that the proposed classification was justified by a "racial imbalance" in hiring and promotion within the fire department. But in and of itself, the *existence* of a racial imbalance, or of a disproportionate representation of the sexes, would not give rise to a compelling state interest sufficient to warrant the preferential treatment implicit in an affirmative-action hiring classification based on race or sex. In *University of California Regents* v. *Bakke, supra,* 438 U.S. 265, those justices who dealt with the equal protection issue appeared to agree that to justify a race-conscious program the racial disparity at which the program is to be directed should be shown to be *attributable to past discrimination.* In his lead opinion, Justice Powell suggested that such a program should be "far more focused than the remedying of the effects of 'societal discrimination,' an amorphous concept of injury that may be ageless in its reach into the past. [¶] We have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the absence of judicial, legislative, or administrative findings of constitutional or statutory violations. [Citations.] After such findings have been made, the governmental interest in preferring members of the injured groups at the expense of others is substantial, since the legal rights of the vic-

---

[6]The pertinent findings read as follows:

"32. Proportional representation by race of the workforce of the CITY OF BERKELEY, or of any department thereof, including its Fire Department, is entirely unrelated to the efficiency of such workforce or department and is entirely unrelated to the services provided by such workforce or department.... Further, proportional composition by race of the workforce of the CITY OF BERKELEY, or of any department thereof, including the Fire Department, is entirely unrelated to any other goal or legislative end for which that workforce or department is retained, established or designed.

"33. Proportional representation by sex of the workforce of the CITY OF BERKELEY, or of any department thereof, including its Fire Department, is entirely unrelated to the efficiency of such workforce or department, and is entirely unrelated to the services provided by such workforce or department.... Further, proportional composition by sex of the workforce of the CITY OF BERKELEY, or of any department thereof, including the Fire Department, is entirely unrelated to any other goal or legislative end for which that workforce or department is retained, established or designed.

"34. The race of an employee of the CITY OF BERKELEY in any department, including the Fire Department, is entirely unrelated to that employee's ability to perform his or her duties in a proper, efficient, and productive manner.

"35. The sex of an employee of the CITY OF BERKELEY and any department, including the Fire Department, is entirely unrelated to that employee's ability to perform his or her duties in a proper, efficient, and productive manner.

"36. The race of a particular employee in the CITY OF BERKELEY is unrelated to that employee's ability to establish rapport with minority persons in the community."

tims must be vindicated. In such a case, the extent of the injury and the consequent remedy will have been judicially, legislatively, or administratively defined. Also, the remedial action usually remains subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit. Without such findings of constitutional or statutory violations, it cannot be said that the government has any greater interest in helping one individual than in refraining from harming another. Thus, the government has no compelling justification for inflicting such harm." (Pp. 307-309 [57 L.Ed.2d at pp. 782-783]; fn. 44 omitted.) Justice Brennan, writing for himself and three other justices, read the court's previous decisions less stringently but nevertheless perceived a need to find that the racial imbalance should be attributable to prior discrimination: "Properly construed ... our prior cases unequivocally show that a state government may adopt race-conscious programs if the purpose of such programs is to remove the disparate racial impact its actions might otherwise have *and if there is reason to believe that the disparate impact is itself the product of past discrimination*, whether its own or that of society at large." (P. 369 [57 L.Ed.2d, 820-821]; italics added.) Our own Supreme Court has acknowledged the primacy of decisions of the United States Supreme Court with respect to questions of equal protection under the federal Constitution (cf. *Price* v. *Civil Service Com., supra*, 26 Cal.3d 257, 278, fn. 14), and has recently clearly recognized that even the four concurring justices in *Bakke* would require "the existence of a nexus between past discrimination and present disproportionate ... under-representation ...." (*DeRonde* v. *Regents of University of California* (1981) 28 Cal.3d 875, 886 [172 Cal.Rptr. 677, 625 P.2d 220].)

Here, the trial court expressly found that the City of Berkeley had not discriminated in relevant respects in the past;[7] the record supports

---

[7] The pertinent findings read as follows: "42. The Census figures for the CITY OF BERKELEY do not indicate what proportion of minority persons listed were between the ages of 18 and 35, such as to be eligible for entry-level employment in PERS-jurisdiction Fire Departments. The Census figures do not indicate what percentage of persons of each race, or all races, are between the ages of 18 to 65. The Census does not indicate what percentage of any race described therein was employed, or unemployed, or where they hold jobs if they were employed.

"43. The CITY OF BERKELEY recruits employees on a statewide and, indeed, a nationwide basis. The CITY OF BERKELEY has no information as to what the percentage of the workforce by race was or is in Alameda County, in the San Francisco Bay Area, in the State of California, or in the geographical area (whatever it may be) in which a majority of Berkeley employees live.

"44. The CITY OF BERKELEY has no information as to what proportion of the persons in Berkeley described in the Census actually was seeking work. It has no

these findings. The record contains no legislative or administrative declaration as to past employment discrimination with the City of Berkeley, and denotes only that AAP was enacted in response to a history of discriminatory employment practices in the American society as a whole. In addition, there is positive evidence negating the assumption that the City of Berkeley has ever discriminated against minorities with respect to employment opportunities. For example, Mr. Williams, affirmative action officer, testified that he know of no occasions in the past where appellants had discriminated against any person with regard to employment with the city. Former Fire Chief Robert Kearney also observed no racial discrimination in the fire department throughout his long, 30-year tenure. Fire Chief Victor Porter, who had served in the Berkeley Fire Department for over 14 years, was also called as an adverse witness and testified that he did not know of any instance when the fire department had discriminated against minorities with regard to hirings or promotions. Moreover, the finding of the trial court that the City of Berkeley, its agents, employees and officers had not discriminated in the past on any occasion against any person by virtue of the person's race or sex with regard to employment opportunities with the City of Berkeley in general or its fire department in particular, is supported not only by sufficient evidence, but also by the decision rendered by the federal court in *Brunetti* v. *City of Berkeley* (N.D. Cal. 1975

---

information as to whether or not the statistics included students at the University of California at Berkeley.

"45. The CITY OF BERKELEY has no information and no evidence was presented to indicate whether or not the minority composition of the CITY OF BERKELEY workforce in general, or in its Fire Department in particular, has been or is greater than the proportion of minority applicants for positions.

"46. The CITY OF BERKELEY, and its agents, servants, employees, and officers have not discriminated in the past on any occasion against any person by virtue of that person's race with regard to employment opportunities with the CITY OF BERKELEY in general, or in its Fire Department in particular.

"47. The CITY OF BERKELEY, and its agents, servants and employees, and officers have not discriminated in the past on any occasion against any person by virtue of that person's sex with regard to employment opportunities with the CITY OF BERKELEY in general, or in its Fire Department in particular.

"48. While the percentage of the minority persons in the workforce of the CITY OF BERKELEY is lower than the population as described in the Census, there has been no evidence presented whatsoever such as to explain the difference between the racial composition of the workforce and the racial composition of the city population—if such explanation is needed.

"49. The CITY OF BERKELEY has no information and has presented no evidence to indicate whether or not its percentage of women employees in its workforce is less than or exceeds the percentage of women applicants for positions with the CITY OF BERKELEY in previous years."

Dock No. HC-74-0051 RFP).[8] In *Brunetti*, which, similar to the case at bench, involved reverse discrimination in promotions in the Berkeley Fire Department, the federal court found that there had been no prior discriminatory employment practices and that the affirmative action program by the city had not been launched to rectify past discrimination in the municipal work force.

Appellants suggest that an existing racial imbalance may be deemed prima facie evidence of past societal discrimination and (implicitly) of a causal relation between the past discrimination and the present imbalance. It may be that in an appropriate fact situation an inference of attribution to past discrimination may be drawn from evidence of an existing disproportion in racial or sexual representation (cf. e.g., *DeRonde* v. *Regents of University of California, supra*, 28 Cal.3d 875, 886; *University of California Regents* v. *Bakke, supra*, 438 U.S. 265, 370-372 [57 L.Ed.2d 750, 821-823] (disparity in professional-school admissions inferentially attributable to documented discrimination in public education)), but in this action a showing of disproportion in hiring and promotion within the Berkeley Fire Department could not be so readily attributed to general societal discrimination. The trial court expressly found that appellants had produced no evidence of such attribution (see fn. 7, *supra*).

Finally, appellants appear to argue that a compelling state interest may be inferred from title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). Specifically, they argue that under title VII, "local governments need not wait to be sued or judicially forced into action under title VII ... to remedy discriminatory evidence of racial imbalance." They quote the Washington Supreme Court for the proposition that under title VII "[v]oluntary compliance, rather than court ordered relief, is the congressionally preferred method of achieving equality of employment opportunity" (*Lindsay* v. *City of Seattle* (1976) 86 Wn.2d 698 [548 P.2d 320, 326], cert. den. 429 U.S. 886 [50 L.Ed. 2d 167, 97 S.Ct. 237]).

This statutory argument tends to beg the question whether AAP is in pertinent respects *constitutional* regardless of the *statutory* provisions on which it might be predicated. But we need not reach the question whether a clear expression of congressional intent might somehow provide evidence of compelling state interest for purposes of constitutional

---

[8]We have taken judicial notice of *Brunetti*, an unpublished opinion, pursuant to Evidence Code section 452, subdivision (d).

analysis: We agree with respondents that title VII would neither require nor compel the AAP provisions in question in the circumstances of record. By its simple reading, title VII proscribes employment discrimination based on race, color, religion, sex or national origin in unconditional language and without any qualification (42 U.S.C. § 2000e-2 (a)). Addressing the very problem that is before us, section 703, subdivision (j), of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(j)), provides in equally clear and explicit terms that racial preferences are not required to be granted to any employee or group of employees on account of racial imbalance either.[9]

The legislative history of section 703, subdivision (j), reveals complete harmony between this plain, unmistakable congressional language and the congressional intent. The background facts disclose that the bill which became the Civil Rights Act of 1964 originated in the House of Representatives as H.R. No. 7152. As reported to the House, it did not contain section 703, subdivision (j) (see H.R. No. 914, 1964 U.S. Code Cong. & Admin. News, pp. 2391, 2401-2409). The bill received heated opposition, its opponents expressing the fear that it would impose on unions and employers a federally administered racial quota system. (See generally, EEOC, Legislative History of titles VII and XI, Civil Rights Act of 1964.) When the bill reached the Senate, Senators Clark and Case, its floor managers, filed a report declaring: *"There is no re-*

---

[9] 42 United States Code section 2000e-2(a), provides that *"It shall be an unlawful employment practice for an employer—*

*"(1) to* fail or refuse to hire or to discharge any individual, or otherwise to *discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or*

"(2) *to limit*, segregate, or classify *his employees* or applicants for employment *in any way which would deprive* or tend to deprive *any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."* (Italics added.)

Subdivision (j) of the same section sets forth that *"Nothing contained in this subchapter shall be interpreted to require any employer,* employment agency, labor organization, or joint labor-management committee subject to this subchapter *to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin* employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area." (Italics added.)

*quirement in title VII that an employer maintain a racial balance in his work force. On the contrary, any deliberate attempt to maintain a racial balance*, whatever such a balance may be, *would involve a violation of title VII because maintaining such a balance would require an employer to hire or to refuse to hire on the basis of race.* [¶] [*The employer*] *would not be obliged—or indeed, permitted—*to fire whites in order to hire Negroes, or *to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special* seniority *rights at the expense of the white workers* hired earlier. . . ." (Interpretive Memorandum on title VII of H.R. No. 7152, submitted jointly by Senators Clark and Case, floor managers, 110 Cong. Rec. 7213 (Apr. 8, 1964); EEOC Legislative History, *supra*, p. 3043; italics added.)

In response to the objections of opponents, Senator Clark filed a series of responses to these objections, among them the following: "Objection: The bill would require employers to establish quotas for nonwhites in proportion to the percentage of nonwhites in the labor market area. [¶] Answer: Quotas are themselves discriminatory." (EEOC, Legislative History, *supra*, p. 3015.)

A series of amendments, the so-called Dirksen-Mansfield substitute (which was ultimately adopted by both houses of the Congress), was then framed by supporters of the bill. In order to allay fears of racial preference hiring, the present text of section 703, subdivision (j), was added to the bill. One of its draftsmen, Senator Humphrey, explained its purpose: "A new subsection 703(j) is added to deal with the problem of racial balance among employees. *The proponents of this bill have carefully stated on numerous occasions that title VII does not require an employer to achieve any sort of racial balance in his work force by giving preferential treatment to any individual or group. Since doubts have persisted, subsection (j) is added to state this point expressly.*" (Remarks of Senator Humphrey, 110 Cong. Rec. 12723 (June 4, 1964); EEOC Legislative History, *supra*, p. 3005; italics added.)

In addition, the legislative history clearly reflects that title VII was intended to "cover white men and white women and all Americans" (Remarks of Rep. Celler, 110 Cong. Rec. 2578 (1964)), and to create an "obligation not to discriminate against whites." (*Id.*, at p. 7218 memorandum of Senator Clark. See also memorandum of Senators Clark and Case, *id.*, at p. 7213, and remarks of Senator Williams, *id.*, at p. 8912.)

The Equal Employment Opportunity Commission (EEOC) whose interpretations are entitled to great deference (*Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424, 433-434 [28 L.Ed.2d 158, 165, 91 S.Ct. 849]), has consistently interpreted title VII to proscribe racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites, holding that to proceed otherwise would "constitute a derogation of the Commission's Congressional mandate to eliminate all practices which operate to disadvantage the employment opportunities of any group protected by Title VII, including Caucasians" (EEOC Decision No. 74-31, 7 FEP 1326, 1328, CCH EEOC Decisions, ¶ 6404, p. 4084 (1973)).

United States Supreme Court cases preceding *Bakke* also gave the interpretation that title VII prohibits racial discrimination against any race, including whites. Thus, in *McDonald* v. *Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273 [49 L.Ed.2d 493, 96 S.Ct. 2574], the court concluded that white employees were entitled to relief when the employer dismissed them for misbehavior, but retained a similarly situated black employee. Speaking for a unanimous court, Justice Marshall emphasized that title VII is not limited to discrimination against members of any particular race, and that it prohibits discriminatory preferences for any racial group, minority or majority. In relying on the legislative history and the EEOC interpretation of title VII, the Supreme Court held that "Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable were they Negroes and Jackson white." (Pp. 279-280 [49 L.Ed.2d at pp. 500-501].) In *Trans World Airlines, Inc.* v. *Hardison* (1977) 432 U.S. 63 [53 L.Ed.2d 113, 97 S.Ct. 2264], the Supreme Court again reaffirmed its earlier statement that the purpose of title VII was to insure that similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex or national origin, and concluded that "The emphasis of both the language and the legislative history of the statute is on eliminating discrimination in employment; similarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin. This is true regardless of whether the discrimination is directed against majorities or minorities." (Pp. 71-72 [53 L. Ed.2d at p. 123]; see also to the same effect *Alexander* v. *Gardner-Denver Co.* (1974) 415 U.S. 36 [39 L.Ed.2d 147, 94 S.Ct. 1011].)

We note in passing that *Griggs* v. *Duke Power Co., supra,* 401 U.S. 424, supports rather than negates or contradicts the principles enunci-

ated in the foregoing cases. While observing that under the Civil Rights Act practices, procedures or tests neutral on their face cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices, the court in *Griggs* repeatedly underlined that the very purpose of title VII is to promote hiring on the basis of job qualifications and to eliminate discriminatory preferences based on race or sex with respect to any group, majority or minority. As the court put it, "Title VII 'expressly protects the employer's right to insist that any prospective applicant, Negro or white, *must meet the applicable job qualifications.* Indeed, *the very purpose of title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color.*'" (P. 434 [28 L.Ed.2d at p. 166]; italics partially added.) And, "the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. *Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.* What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." (Pp. 430-431 [28 L.Ed.2d, p. 164]; italics added.)

In summary, the record supports a conclusion that appellants did not show a compelling state interest, in the requisite constitutional sense, to be served by the challenged provisions of AAP.

## 2. *Necessity*

▊ Even were we to assume for the sake of argument that the record in this action demonstrates a compelling state interest in achieving proportional employment within the Berkeley Fire Department, we would conclude that the record does not establish, in the constitutionally requisite sense, the *necessity* for the proposed classification. Consistent with the trial court's findings,[10] the record affirmatively shows that

---

[10]The relevant court findings are as follows: "39. Procedures employed by the CITY OF BERKELEY prior to adoption of the AAP operated such as to substantially increase the proportions of minority persons holding supervisory or promotional positions in employment in the CITY OF BERKELEY.

"40. Procedures employed by the CITY OF BERKELEY prior to adoption of the AAP operated in a manner to substantially increase the percentage of women in supervisory or promotional positions in employment in the CITY OF BERKELEY workforce.

"41. Alternate methods exist to increase the proportion of minorities and of women in supervisory or managerial positions in the CITY OF BERKELEY workforce, including in its Fire Department."

the establishment of an inflexible, 100 percent racial quota system in AAP was not necessary to achieve the policy goal of proportional employment (assuming arguendo that such goal was acceptable), and that workable alternative methods were available and existed in carrying out the objective. Thus, it appears that prior to the passage of AAP, the City of Berkeley conducted extensive recruiting and education to increase the percentage of minority applicants in the fire department. Larry Williams, personnel director and affirmative action officer, testified that such program was quite successful and that the proportion of minority firefighter applicants dramatically rose from about 50 out of 1,000 in the mid-1960s, to about 150 out of 350-400 immediately prior to the passage of AAP, which corresponds to an increase from 5 percent to over 30 percent in the surveyed period. Mr. Williams' testimony was corroborated by Councilman Sweeney, who restated that as a result of the city's vigorous efforts and education there was considerable success in recruiting minority applicants to the fire department prior to the adoption of AAP.

### 3. *Impact*

■ Further, the quota system employed in AAP purported to exclude from new hirings and promotional positions not only a certain number of the majority race, but the white class as a whole, at least until the projected minority quotas were filled in the work force of the city. Needless to say, the rigid quota system thus conjured cannot be regarded as a means imposing a lesser or the least limitation possible upon the group disadvantaged by the classification, as envisaged by the case law (*Dunn* v. *Blumstein, supra*, 405 U.S. 330, 342-343 [31 L.Ed. 2d 274, 284-285]; *Loving* v. *Virginia, supra*, 388 U.S. 1, 11 [18 L.Ed. 2d 1010, 1017]; *McLaughlin* v. *Florida, supra*, 379 U.S. 184, 192-193 [13 L.Ed.2d 222, 228-229]; *Price* v. *Civil Service Com., supra*, 26 Cal.3d 257, 282; *University of California Regents* v. *Bakke, supra*, 438 U.S. 265, 308 [57 L.Ed.2d 771, 782]). AAP signally lacks features which have been deemed significant to a finding of validity in the analysis of other affirmative-action plans: Limited duration (cf. *Price* v. *Civil Service Com., supra*, p. 261), continuing oversight (cf. *University of California Regents* v. *Bakke, supra*, p. 308 [57 L.Ed.2d at p. 782]), synthesis of factors such as race and sex with several other factors, *all* of which are to be considered in arriving at the classification (cf. *De-Ronde* v. *Regents of University of California, supra*, 28 Cal.3d 875, 884), and use of flexible ratios rather than fixed quotas (cf. *Price* v. *Civil Service Com., supra*, 26 Cal.3d at pp. 266, 282), among others.

■ Appellants argue that the racial quotas here challenged should pass constitutional muster because the discrimination in favor of ethnic minorities and women was "benign," aimed at redressing past injustices and prior unequal treatment. We are unable to agree. Appellants' contention is neither meritorious nor novel. The same argument was raised in *Bakke* and rejected by the majority of the United States Supreme Court, as follows: "Petitioner urges us to adopt for the first time a more restrictive view of the Equal Protection Clause and hold that discrimination against members of the white 'majority' cannot be suspect if its purpose can be characterized as 'benign.' The clock of our liberties, however, cannot be turned back to 1868. *Brown v. Board of Education, supra,* [347 U.S. 483 (98 L.Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180)], at 492; accord, *Loving v. Virginia, supra,* at 9. *It is far too late to argue that the guarantee of equal protection to all persons permits the recognition of special wards entitled to a degree of protection greater than that accorded others.*" (Pp. 294-295 [57 L.Ed.2d at pp. 773-774]; italics partially added.)

In elaborating on the reasons why "benign" discrimination may not be accepted, the majority of the Supreme Court advanced three major considerations: "First, it may not always be clear that a so-called preference is in fact benign. Courts may be asked to validate burdens imposed upon individual members of particular groups in order to advance the group's general interest. See *United Jewish Organizations* v. *Carey,* 430 U.S. at 172-173 (Brennan, J., concurring in part). Nothing in the Constitution supports the notion that individuals may be asked to suffer otherwise impermissible burdens in order to enhance the societal standing of their ethnic groups. Second, preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relationship to individual worth. See *DeFunis v. Odegaard,* 416 U.S. 312, 343 (1974) (Douglas, J., dissenting). Third, there is a measure of inequity in forcing innocent persons in respondent's position to bear the burdens of redressing grievances not of their making." (*Bakke, supra,* 438 U.S. at p. 298 [57 L.Ed.2d at p. 776].)

Finally, we find it of singular importance that in rejecting the notion of "benign" discrimination the majority of the Supreme Court cited with approval Professor Bickel's comment on the self-contradictory nature of reverse discrimination: "'The lesson of the great decisions of the Supreme Court and the lesson of contemporary history have been the same for at least a generation: *discrimination on the basis of race is il-*

*legal, immoral, unconstitutional, inherently wrong, and destructive of democratic society. Now* this is to be unlearned and *we are told that this is not a matter of fundamental principle but only a matter of whose ox is gored.* Those for whom racial equality was demanded are to be more equal than others. *Having found support in the Constitution for equality, they now claim support for inequality under the same Constitution.*' A. Bickel, The Morality of Consent 133 (1975)." (*Bakke, supra*, p. 295 [57 L.Ed.2d at p. 774] (Italics added.).)

▮ In light of the overwhelming weight of the cited authorities, appellants' remaining contentions do not call for a lengthy discussion. The argument, that even if section 703, subdivision (j), of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(j)) does not *require* the employer to redress the racial imbalance, an affirmative action to do the same is permissible if done on a *voluntary* basis (*Lindsay* v. *City of Seattle, supra*, 86 Wn.2d 698 [548 P.2d 320]), may be briefly disposed of. The principle of unlawful reverse discrimination would apply whether the racial preference was compelled by the court or voluntarily initiated by the employer, because to the victim of the racial discrimination the result is not noticeably different in either case. Moreover, as mentioned before, the legislative history of title VII makes it eminently clear that the elimination of racial imbalance at the expense of eligible majority employees is not only not required, but indeed not permitted because to do so would force the employer to hire or fire employees on the basis of race. With respect to those cases upholding voluntary affirmative action programs for the purpose of redressing racial imbalance, suffice to say that the recent United States Supreme Court cases (*McDonald* v. *Santa Fe Trail Transp. Co., supra*, 427 U.S. 273; *Trans World Airlines, Inc.* v. *Hardison, supra*, 432 U.S. 63; *Alexander* v. *Gardner-Denver Co., supra*, 415 U.S. 36; and especially *Regents of University of California* v. *Bakke, supra*, 438 U.S. 265) sharply undercut, if not outrightly override them. In light of this new development of law, the continued validity and precedential value of the earlier cases are highly questionable, to say the least.

▮ Appellants' additional claim that in the case at bench no racial discrimination took place, because the grouping of all eligible employees into three qualifying categories and listing of the candidates in alphabetical order, cannot stand in the light of the hiring priority provision of the AAP, already held illegal, which was an integral part of this process. However, no rule of law requires that appellants afford determinative weight to the quantitative factors of test scores or grades where the

AAP's hiring priority policy based on "underutilization" has been eliminated. Nor does Berkeley City Charter, section 119, require a different finding. Thus, those portions of the trial court's decision enjoining the provision of paragraph III of the AAP on the use of written tests, and paragraph V regarding employment list qualifying categories, must be reversed.

 Lastly, in answering appellants' remaining contention that the appointments in dispute were no more than mere exercise of the city manager's discretionary power accorded by the charter (city charter, art. VII, § 28), we briefly note that the discretionary power of the city manager is to be exercised within the framework of AAP which, as discussed at length before, is violative of the equal protection clauses of the federal and California Constitutions.

### The Cross-appeal

The cross-appeal is taken from that portion of the judgment which refuses to promote two respondents, Messrs. Rinne and Jones, to the position of fire captain and fire lieutenant, respectively, and from the denial of attorney's fees to respondents.

The factual background giving rise to the respondents' cross-appeal reveal that the case at bench was tried on a bifurcated basis. The first phase addressed the constitutionality of AAP and called for enjoining appellants from the enforcement of the constitutionally infirm provisions of AAP. After the trial court filed its intended memorandum decision on February 13, 1975, holding that AAP was unconstitutional and illegal upon its face and enjoining appellants from proceeding under the illegal AAP, the liability portion of the case went on trial on March 17, 1975. At the conclusion of the second phase, the lower court found that respondents Hiatt, Salter and Parks, who had been in the meanwhile promoted, were entitled to damages by reason of delay in their promotion. As far as respondents Rinne and Jones were concerned, the trial court concluded that they had no just claim to promotion, due to the fact that there had been no additional vacancies in the fire department, and as a consequence the city manager could not exercise his discretion. Relying on *Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240 [44 L.Ed.2d 141, 95 S.Ct. 1612], the trial court at the same time denied respondents' motion for awarding them attorney's fees. Respondents now argue that the ruling of the trial court was erroneous in both respects.

■ In addressing the first issue, we agree with the trial court that respondents Rinne and Jones were not entitled to promotion. As appears in the record, the promotion of these respondents was raised in a supplemental pleading praying for writ of mandamus or "mandatory injunction." ■ It is well settled that while mandate is an appropriate remedy by which to compel the exercise of discretion by a court or governmental officer or an agency (Code Civ. Proc., § 1085; *Anderson* v. *Phillips* (1975) 13 Cal.3d 733, 736 [119 Cal.Rptr. 879, 532 P.2d 1247]; *Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574, 579 [114 Cal.Rptr. 106, 522 P.2d 666]), this remedy cannot be utilized to compel the exercise of discretion in a particular manner or to reach a particular result (*Hollman* v. *Warren* (1948) 32 Cal.2d 351, 355 [196 P.2d 562]; *Carter* v. *Com. on Qualifications, etc.* (1939) 14 Cal.2d 179, 181 [93 P.2d 140]; *Palmer* v. *Fox* (1953) 118 Cal.App.2d 453, 456 [258 P.2d 30]; 5 Witkin, Cal. Procedure (2d ed. 1971) § 76, p. 3852.) ■ Simultaneously, the record shows that the city charter accorded discretion to the city manager in the appointment, discipline and removal of city employees subject to the civil service provisions of the charter.[11] Since the ordering of the promotion of respondents Rinne and Jones would have been equivalent to mandating the exercise of discretion in a particular manner, and since there were no vacancies to be filled in the fire department, the trial court's refusal to issue a writ of mandamus was proper.

■ On the other hand, the attorney-fee issue must be remanded to the trial court for reconsideration in light of Code of Civil Procedure section 1021.5,[12] enacted while this appeal was pending and therefore

---

[11]City charter, article VII, section 28, subdivision (b), provides that the city manager shall have power, and it shall be his duty "Except as otherwise provided in this Charter, to appoint, discipline or remove all heads or directors of departments, chief officials, and all subordinate officers and employees of the City, subject to the Civil Service provisions of this Charter. Neither the Council nor any of its committees or members shall dictate, either directly or indirectly, the appointment of any person to office or employment by the City Manager or in any manner interfere with the City Manager or prevent him from *exercising his own judgment in the appointment of officers and employees* in the administrative service. Except for the purpose of inquiry, the Council and its members shall deal with the administrative service solely through the City Manager, and neither the Council nor any member thereof shall give orders to any subordinates of the City Manager, either publicly or privately" (italics added).

[12]Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees

applicable to appellants' motion for attorney fees (cf. *Woodland Hills Residents Assn., Inc., v. City Council* (1979) 23 Cal.3d 917, 928-932 [154 Cal.Rptr. 503, 593 P.2d 200]). From the record before us, it appears that appellants should be able to demonstrate the existence of each of the elements essential to an award of attorney fees under section 1021.5 (cf. *Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428, 434-435 [159 Cal.Rptr. 473]), but inasmuch as no party had an opportunity to argue to the trial court with reference to the then unenacted section 1021.5, we deem it appropriate simply to reverse the trial court's denial of attorney fees and to remand the issue for further consideration in light of the new section, as construed in several subsequent appellate decisions, including those cited above in this paragraph (cf. *Woodland Hills Residents Assn., Inc.* v. *City Council, supra*, pp. 948-949; *Kievlan* v. *Dahlberg Electronics, Inc.* (1978) 78 Cal.App.3d 951, 959 [144 Cal.Rptr. 585]).

The judgment, insofar as it fails to make an award of attorney fees to respondents, is reversed, with directions to the trial court to reconsider appellants' motion for attorney fees in light of Code of Civil Procedure section 1021.5 and to enter judgment for any attorney fees to which it finds appellants entitled. Those portions of the judgment enjoining that part of paragraph III of AAP pertaining to the use of written tests, and the whole of paragraph V of AAP regarding employment list qualifying categories are reversed. In all other respects, the judgment is affirmed. Respondents to recover costs.

Taylor, J.,* concurred.

---

should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.